## MOXHAM v. SHERWOOD CO. OF WEST VIRGINIA.

(Circuit Court of Appeals, Fourth Circuit. July 6, 1920.)

No. 1802.

1. **Mines and minerals ⊂⇒59—Lease held not conditioned on finding iron ore.**
   A lease of a large tract of land, at a fixed royalty on iron ore extracted therefrom and the customary royalty on other minerals taken therefrom, with a fixed minimum royalty, is not impliedly conditioned on the existence of iron ore in commercial quantities on the land, even though the mining of iron ore was the lessee's principal purpose, so that the lessee cannot have the lease set aside merely because of failure to find iron ore.

2. **Mines and minerals ⊂⇒59—Lease held not to be set aside because of mutual mistake as to existence of ore.**
   A lease for a royalty on ores produced from the land, with a fixed minimum, cannot be set aside for mutual mistake as to the existence of ore, where the evidence showed that the lessee had caused his engineer to examine the property and signed the lease on the engineer's report showing the existence of ore.

3. **Evidence ⊂⇒433(5)—Parol evidence of negotiations admissible against party attacking lease for mutual mistake.**
   Where plaintiff was seeking to set aside a lease for mutual mistake, parol evidence as to the situation of the parties and the negotiations leading to the lease is admissible against him.

⊂⇒For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

**4. Mines and minerals ⬤⇒70 (2)—Minimum royalty under lease held payable until lessor terminated lease.**

Under a lease for royalty on ores produced, with a stated minimum, for 20 years, unless sooner terminated under its provisions. which gave the lessee no option to terminate the lease, except by purchase of the property, but did give the lessor the option to terminate at the end of 5 years, or to extend for 15 years, the lessor was not bound at the end of 5 years to terminate or extend, but could allow the lease to continue, and collect the minimum royalty thereunder after the expiration of the 5 years, until he did elect to terminate the lease.

Appeal from the District Court of the United States for the Southern District of West Virginia, at Charleston; Benjamin F. Keller, Judge.

Suit by A. J. Moxham against the Sherwood Company of West Virginia. From a decree dismissing the bill, plaintiff appeals. Affirmed.

Connor Hall and D. C. T. Davis, Jr., both of Charleston, W. Va. (Davis, Davis & Hall, of Charleston, W. Va., on the brief), for appellant.

Joseph C. France, of Baltimore, Md., Francis T. Homer, of New York City, and Malcolm Jackson, of Charleston, W. Va. (Angus W. McDonald and Brown, Jackson & Knight, all of Charleston, W. Va., George H. Olney, of New York City, and Willis & Willis, of Baltimore, Md., on the brief), for appellee.

Before KNAPP and WOODS, Circuit Judges, and ROSE, District Judge.

KNAPP, Circuit Judge. Plaintiff appeals from a decree of the court below, entered November 4, 1919, which dismisses his bill of complaint and orders judgment against him for $269,965.59, with interest from that date. The case comes here on a record of over 1,200 pages, with briefs of counsel aggregating 500 more, but a comparatively short statement will disclose the questions to be decided.

The suit is brought to rescind and cancel a lease of certain lands in Greenbrier and Pocahontas counties, W. Va., amounting in all to some 74,500 acres. The lease is dated December 31, 1907, and recites, among other things, that defendant owns, or is able to acquire and transfer title to, approximately 40,525¾ acres, of which it owns about 32,500 acres in fee, and in the remainder of which it owns or controls the mineral rights; that it also owns or controls some 34,000 acres additional, "which as now supposed do not contain minerals, but which may contain such minerals"; that plaintiff is desirous of leasing said lands and acquiring all mineral rights therein, "for the purpose of mining and removing the minerals therefrom"; and that he is also desirous of obtaining an option to purchase the lands, or the mineral rights therein, "as hereinafter more particularly described." Following these recitals the lease demises to plaintiff the lands mentioned, "to have and to hold the said lands and the said mineral rights unto the said lessee, his executors, administrators, and assigns, for the purpose of mining and removing therefrom all minerals," for the term named. The lessee agrees to pay the lessor, "as rent for the hereinbefore

more particularly referred to and described lands and mineral rights," a royalty of 20 cents per long ton of 2,240 pounds for all iron ore mined upon or from the property, and "the usual and customary rate of royalty in the state of West Virginia" for all other minerals, such as coal, oil, gas, limestone, and the like. The lessee also agrees that the minimum payment of royalty for any one year shall equal the sum of $20,000, and further agrees that, if at the end of any calendar year the royalty paid does not equal that sum, he will pay the lessor a sufficient amount to make up the difference, with a proviso not now material. The provision for a minimum royalty of $20,000 was to be in effect for 5 years, at the end of which time the lessee could elect to continue the lease for 15 years more, but only on condition of paying a minimum royalty of $100,000 a year; the lessor also had the option, at the end of the 5-year period, of extending the lease for the further term of 15 years, in which case, however, the minimum royalty was to remain at $20,000 a year; and the lessee is given the option of purchasing the property for $2,000,000 at any time during the 5-year period.

The bill of complaint, filed in November, 1908, alleges in substance that plaintiff entered into the lease by reason of his belief that the lands contained iron ore in workable quantities; that such belief was largely induced by reports of defendant's geologist, advising and estimating that there was a large amount of ore on the property, which reports were exhibited to him before the lease was executed; that he had prospected the lands in a thorough manner, and endeavored in good faith to find deposits of ore that could be profitably mined; and that ore in workable amount was not to be found on the property. There is no charge of fraud or deceit on the part of defendant; the right to relief being predicated on the mutual mistake of the parties as to the existence of large quantities of ore on the lands demised. The answer of defendant admits that both parties supposed the lands to contain ore in workable amount, but denies that plaintiff's tests have been suitable or sufficient, and avers that in any event he committed himself to the venture with full understanding of the risk and knowingly engaged in a contract of hazard. A supplemental answer sets up a counterclaim for the sums due under the terms of the lease. Exceptions to the answer were overruled, depositions of witnesses taken, and a final hearing had, which resulted in dismissal of the complaint, and judgment for defendant on its counterclaim in the amount above stated.

For the purpose of deciding the appeal, we shall assume, without reviewing the evidence, that plaintiff made every effort that could reasonably be required of him to discover ore in workable quantities, and that he failed of success because the ore was not there to be discovered. This resolves in his favor the dispute to which much of the testimony was directed, and brings us at once to the question whether on that assumption he has shown himself entitled to any relief.

[1] It is first contended that the lease on its face carries the implication that payment thereunder was dependent on the finding of ore deposits of commercial value. Does it call for that construction?

Contracts of the class to which the lease belongs have been the frequent subject of litigation, and numerous decisions, not all of them in harmony, are found in the reports. In the briefs before us more than 80 cases are cited. We shall not attempt to add to or repeat the discussion, since it seems clear to us that plaintiff's contention in this regard should be rejected. In terms the contract is absolute. It purports to impose an unqualified obligation; and the presumption is that it means what it says. The burden of showing that it implies a condition not expressed in its provisions is therefore cast upon plaintiff, and in our opinion that burden has not been met.

Undoubtedly the main object of plaintiff was to obtain iron ore in paying quantities. But that does not appear from the lease itself. The grant covers all minerals and mineral rights, besides including an extensive tract of land not supposed to contain any mineral deposits. Nowhere does its language indicate that the mining of iron ore was the lessee's sole purpose, even if it be inferable that this was his principal purpose, and much less does it imply that failure to find such ore in workable amount would enable him to avoid the obligation. In our judgment, the decided weight of authority, and especially of federal authority, is to the effect that such a contract may not be set aside on the ground of implied condition. A few citations will suffice.

In Lehigh Zinc & Iron Co. v. Bamford, 150 U. S. 665, 672, 14 Sup. Ct. 219, 221 (37 L. Ed. 1215), which seems directly in point, the Supreme Court says:

"Looking at all the provisions of the lease, it is clear that the defendant engaged to pay, as rent in each year, the royalties fixed in the lease, and if in any year the royalties fell below the sum of $1,000, it was to make up the deficit, so that the latter sum should, in any event, be paid annually as rent. The defendant took the chance of a failure to find ore in sufficient quantities to justify working the mines, and the plaintiffs took the chance of not obtaining more than $1,000, annually, during the existence of the lease, for the use of buildings and fixtures that had cost them more than $60,000. To secure the payment, annually, of at least $1,000, the right was reserved to the plaintiffs to terminate the lease if the company failed in any year to pay that sum as rent; and that the company might get the advantage of any developments indicating that the leased premises were of substantial value, the exclusive privilege was reserved to it of purchasing them at any time while the lease remained in force for the price of $125,000."

In the recent case of Berg v. Erickson, 234 Fed. 817, 148 C. C. A. 415, L. R. A. 1917A, 648, in which the subject is discussed at some length and numerous authorities cited, Judge Sanborn (234 Fed. at page 821, 148 C. C. A. 419 [L. R. A. 1917A, 648]) states the following as "the rule adopted by the Supreme Court":

"It is that, although general words, which cannot be reasonably supposed to have been used with reference to the possibility of an event, may not be held to bind one, yet where one, at the time of making his contract, must have known or could have reasonably anticipated, and in his contract could have guarded against, the possible happening of the event causing the impossibility of his performance, and nevertheless he makes an unqualified undertaking to perform, he must do so or pay the damages for his failure."

Among many others of equally decisive import are the cases of Abbott v. Smith, 19 D. C. 600; Berwind-White Coal Mining Co. v. Mar-

tin, 124 Fed. 313, 60 C. C. A. 17; McDowell v. Hendrix, 67 Ind. 513; Consolidated Coal Co. v. Peers, 150 Ill. 344, 37 N. E. 937; N. Y. Coal Co. v. New Pittsburgh Coal Co., 86 Ohio St. 140, 99 N. E. 198; and Lawson v. Williamson Coal & Coke Co., 61 W. Va. 669, 57 S. E. 258.

It is enough to add, and the record warrants the observation, that plaintiff himself appears to have lacked somewhat of confidence in the contention here examined, since he framed his bill to set aside the lease, and has tried the case, not on the theory of implied condition, but distinctly on the theory of mutual mistake.

[2] Is the lease invalid by reason of a mutual mistake of the parties as to the existence of a large amount of ore on the property, or did plaintiff knowingly and avowedly assume the risk in that regard? Related to this issue, and having an important bearing thereon, is a question of evidence which will presently be considered.

We need not review in detail the testimony on the issue of mutual mistake, but some of its more salient features may be briefly noticed. The execution of this lease, and the incidents immediately preceding, were not the beginning of plaintiff's connection with these lands. His attention had been called to them in April, 1907, eight months before, and not long afterwards he began negotiations for their purchase. Early in the following month a verbal agreement appears to have been reached for an option, until December 1st, to buy the property outright for $2,000,000, provided notice of election to do so were given defendant by the 15th of November. The complete agreement, however, was not reduced to writing and signed by the parties until the 24th of June. But by the middle of May plaintiff had his own mining engineer on the ground and the work of prospecting started.

It will thus be seen that plaintiff had been in possession of the property, with full opportunity to make any investigation he desired, for some 6 months before he was called upon to decide whether or not he would avail himself of the option. When the time for election arrived he was not prepared to purchase, either because he still had some doubt as to the extent and value of the ore deposits or because, as defendant suggests, the prevailing conditions made it difficult to finance the enterprise, or for reasons less apparent. On the other hand, he was plainly unwilling to relinquish control of the property, and thereby forego the great gains which then appeared highly probable, if not practically certain, to say nothing of losing the money already expended. It therefore seems but reasonable to infer that his immediate desire was to get additional time in which to make his election, and that the minimum royalty fixed by the lease was the price he offered for a 5 year further option. However this may be, we think the facts here referred to tend strongly to show that plaintiff entered into the new contract with the definite intention of running the risk.

And here it may be mentioned as of some significance that on the 21st of December, 10 days before the lease was executed, the mining engineer employed by plaintiff submitted to him an elaborate report in writing, covering an examination of 7 months, in which it was estimated that the property contained upwards of 72,000,000 tons of ore.

(It appears, by the way, that defendant had no knowledge of this report until the fact was brought out at the trial.) Obviously, on the basis of this expert's estimate, or anything near it, the lands were worth several times, and even many times, the $2,000,000, for which they could be bought under the option clause of the contract; and it may well be believed that plaintiff, in the confident expectation of millions of profit, was more than content to hazard the chance of possible failure.

But more persuasive than anything else are the declarations and admissions of plaintiff himself, in various letters and as a witness in his own behalf. Among other things, he says frankly that those who spoke for defendant were known by him to be without experience in mining operations; that no representations were made or assurances given by them; that he solicited the lease and proposed a minimum royalty of $20,000 a year; that he was unacquainted with defendant's geologist, Lehman; that it is true "that I stated that, regardless of anything that the reports from others might show, I would be guided by the examination of my own experts into the property"; that he had received the report of his mining engineer, above mentioned, before he executed the lease; that defendant knew nothing of that report; and that "at the time the lease was entered into it was my firm conviction, based on the opinion of Mr. Fulton, that a very large quantity of ore existed on the property."

In short, it seems to us that plaintiff's own testimony, especially when viewed in the light of the situation existing when the lease was signed, and in connection with the previous happenings, forces the conclusion that he deliberately and knowingly, and with full appreciation of what he was doing, took upon himself a contract of hazard. Not only has he failed to carry the burden of this issue, which concededly rests upon him, but in our judgment the decided preponderance of proof is against his contention.

[3] It is argued, however, that this testimony was improperly received and considered, because in violation of the rule that parol proof may not contradict or vary a written instrument. The argument is without merit. It is refuted by the very nature of the controversy. Defendant is not seeking to alter or amend in any respect the agreement set forth in the writing, but, on the contrary, stands for its observance and enforcement to the letter. It is plaintiff who seeks its modification, the reading into it of an unexpressed condition, in order that he may escape the liability of its plain provisions. By the allegations of his bill and the evidence offered by him at the trial, he tendered the issue of a mutual mistake of fact, quite apart from the lease itself, and that tender opened the door of invitation to everything that passed between the parties before and when the contract was executed. The testimony in question was clearly admissible, and rightfully taken into account.

[4] Plaintiff makes the point that in no case can he be held liable for minimum royalties for more than 5 years, because he vacated the lands and gave notice of his surrender thereof in October, 1908, and because defendant did not at the end of the 5-year period give

written notice of its election to continue the lease for the further term of 15 years at the minimum royalty provided in that case. We agree with the court below that the point is not well taken. The habendum clause of the lease declares that it is to run "from the 1st day of January, 1908, for and during the term of 20 years thereafter next ensuing, that is, until the 1st day of January, 1928, unless the said term shall be sooner terminated by the purchase of said lands and premises and mineral rights as hereinafter provided, or by certain other provisions of this agreement." But there is no provision under which plaintiff could shorten the term by abandonment and notice of surrender, either during the 5-year period or afterwards. He could not in that way bring the contract to an end and relieve himself of further liability.

Defendant had the option, when the 5 years expired, if plaintiff had not elected to purchase, of terminating the lease within the next 6 months, on specified conditions, or of extending it for the balance of the 20-year term at the minimum of $20,000 a year. But if it took the latter course it would lose for fifteen years the right to terminate the agreement and regain possession of its lands; and we think it could not have been intended that defendant should be put to that alternative by the failure of plaintiff either to buy the property or to agree to pay the higher minimum. On the contrary, as we read the contract, defendant was not required, at the end of five years, to give a notice which would bind it for 15 years more, but could reserve the right to terminate the lease at an earlier date, if it so desired, and as it did by the notice of September 20, 1917. It follows that plaintiff's obligation continued until the expiration of the 10 days named in that notice.

It is of course unfortunate for plaintiff that he should be compelled to pay such a large sum for something he did not get; but we are convinced, after careful study of the record, that he bound himself with intention and understanding to a contract of chance, and therefore cannot justly complain because it turned out that he made a bad bargain.

Affirmed.