## NORTH AMERICAN OIL CO. v. GLOBE PIPE LINE CO.

## GLOBE PIPE LINE CO. v. NORTH AMERICAN OIL CO.

(Circuit Court of Appeals, Eighth Circuit. May 12, 1925.)

Nos. 6727, 6760.

1. **Sales ⊕=81(6)—Contract for sale of oil held to require buyer to take oil each day.**

Defendant owned an oil lease, on which it had 400,000 barrels of oil in storage and a well producing 20,000 barrels daily. Plaintiff had a 4-inch pipe line extending from the lease to a railroad station, where it had a loading rack. The parties made a contract by which, for 20 days or so much longer as it should be renewed, plaintiff agreed to purchase such amount of oil as it could take and market, provided that it should "take an average of 1,000 daily or more." *Held* that, in view of the situation of the parties and the fact that defendant had, a large and rapidly accumulating quantity of oil, which required storage, the contract required plaintiff to take oil every day to the amount approximately of 1,000 barrels, and not merely to take the total quantity at some time during the term.

2. **Sales ⊕=84—Provision that contract should be considered "renewed" until terminated by notice held to create separate term.**

Under a provision of the contract that it should be considered renewed for additional periods of 20 days until terminated by notice by one of the parties, the word "renewed" is to be given its usual meaning, and each renewal created a separate term.

3. **Sales ⊕=172—Act of God held to excuse performance of contract.**

Shortly after performance of the contract had begun, all the oil on the lease was destroyed by fire caused by lightning, which also made it necessary to shut down the well for a time. *Held* that, since the contract was made solely with reference to the oil on and produced from that particular lease, its destruction through an act of God excused performance while effective.

**4. Sales** ☞172—**Delivery of oil under contract held excused by failure of well with reference to which the contract was made.**

A provision of the contract required defendant to send through the pipe line oil, in addition to that purchased by plaintiff, to the extent of two-thirds of the capacity of the pipe line, to be carried and loaded by plaintiff for defendant, provided cars could be secured. Before the end of the contract period, as renewed, defendant's well ceased to produce. *Held*, that it was excused from further performance, notwithstanding the fact that during the time of renewed performance it had, as required by the contract, shipped and sold to others sufficient oil to have completed delivery to plaintiff.

In Error to the District Court of the United States for the Western District of Arkansas; Frank A. Youmans, Judge.

Action at law by the Globe Pipe Line Company against the North American Oil Company. Judgment for plaintiff, from which both parties bring error. Reversed and remanded on defendant's writ of error.

J. E. Bennett, of Kansas City, Mo. (Estelle Balfour Bennett, of Kansas City, Mo., on the brief), for North American Oil Co.

Robert C. Knox, of El Dorado, Ark. (H. S. Powell and H. P. Smead, both of El Dorado, Ark., on the brief), for Globe Pipe Line Co.

Before STONE and KENYON, Circuit Judges, and SCOTT, District Judge.

STONE, Circuit Judge. This is an action by the buyer for damages from breach of a contract to deliver oil. The court directed a verdict for $7,100. From the judgment entered thereon, each party has sued a writ of error.

The essential facts are not in dispute. The contract is as follows:

"This indenture made and entered into the 27th day of November, 1922, by and between North American Oil Company, hereinafter called the North American Company, party of the first part, and Globe Pipe Line Company, hereinafter called the Globe Company, party of the second part, witnesseth the following facts and agreements:

"(1) The said North American Company owns the oil and gas lease covering the SE¼ of the SW¼ of section 31, township 15, range 15, Ouachita county, Arkansas.

"(2) The Globe Company owns a twenty-eight (28) car loading rack near Smackover on the Missouri Pacific Railroad with a four-inch pipe line extending from said loading rack to the lease of said North American Company.

"(3) In consideration of the sum of $1.00 and the further payments to be made as hereinafter set out, the North American Company hereby agrees to deliver into the pipe line of the Globe Company such amount of the oil from the tanks on its lease as the Globe Company is able to take and market: Provided, however, that the Globe Company shall take an average of 1,000 barrels daily or more during the life of this contract.

"(4) The Globe Company shall pay for all oil so furnished the sum of 30c per barrel and payment shall be made on the 1st and 16th days of each calendar month for oil taken up on such dates.

"(5) All oil furnished under this contract shall be clean pipe line oil and shall contain not more than 1% BS and water.

"(6) The Globe Company also agrees to load through its line into cars placed on its rack for the North American Company whatever amount of oil can be loaded through its line after the oil it has purchased has been loaded; and the North American Company agrees to furnish for loading under this provision of this contract two-thirds of the idle capacity of said four-inch pipe line each day: Provided, however, that this provision is subject to the North American Company being able to get car service in and out for its cars. The Globe Company shall be paid by the North American Company the sum of 7½c per barrel for furnishing loading rack facilities and loading said oil through its line, and settlement for the same shall be made at the time hereinbefore provided for oil purchased.

"(7) The North American Company will make all the connections to its tanks and bring the oil to the gate valve and shall furnish pump for pumping oil.

"The term of this contract shall be twenty (20) days: Provided, however, that the same shall be considered renewed for additional periods of twenty (20) days each, until one of the parties shall give the other ten (10) days written notice of intention to terminate same."

At the time this contract was made, defendant had, on this leasehold, a well producing about 20,000 barrels per day and about 400,000 barrels of oil in tanks and earthen pits. There was a necessary delay in getting ready to run the oil under the contract so that plaintiff was not prepared to receive oil until December 3d, when 1,267 barrels were run. At request of plaintiff, the oil was shut off that night. Before ordered turned on again, the stored oil was consumed by fire started by lightning. Be-

cause of the fire, the oil well had to be shut down temporarily. The pits were not cool enough for some days to receive oil and deliveries could not be resumed until December 21st or 22d. From that date to January 27th, deliveries to plaintiff were 30,253 (or 30,283) barrels, at the rate of about 1,000 barrels a day. Within this same period (between December 21st and January 10th) defendant sold and delivered to the Standard Oil Company 80,246 barrels from this lease. After January 27th, there were no deliveries as the well had ceased flowing and the tankage was exhausted. Three times the contract was automatically renewed until, on January 27th, defendant gave notice of termination of the contract as of February 15th. February 4th, plaintiff wrote to defendant claiming that defendant had contracted to deliver 80,000 barrels during the 80 days of the contract; that less than 33,000 barrels had been delivered and demanded delivery by February 15th of the remaining 47,000 barrels. February 9th, defendant answered denying liability.

The court treated the arrangement as one contract for eighty days, with the requirement to take approximately 1,000 barrels each day; that there had been performance or legal excuse for nonperformance up to January 28th and held defendant liable for the period of January 28th to February 15th, both inclusive, at the rate of 1,000 barrels per day. The measure of damages was the difference in sale price and market price in this oil field for the period of liability.

The issues presented by the cross-writs of error are as follows:

(1) Were the requirements as to receipt and delivery of oil upon a daily basis, with a minimum requirement of approximately 1,000 barrels each day?

(2) Was this one contract for 80 days or four successive contracts of 20 days each?

(3) Was the fire a legal excuse for nondelivery during the period it prevented delivery?

(4) Irrespective of the two above matters, has the plaintiff the right to require delivery of more than 1,000 barrels a day, as it did February 4th, either on the ground that it was "able to take and market" the "over 47,000 barrels" then demanded or on the related ground that the contract provided for a minimum and maximum amount and the above demand was within the maximum?

(5) Was the measure of damages used by the court correct?

## Daily Basis.

[1] Plaintiff contends that the contract did not require it to *accept* and receive any oil upon any particular day during the contract but that it could order oil whenever it desired and in whatever quantities; provided only, that it took, at some time during the contract, a minimum amount equal to 1,000 barrels for every day the contract lasted. Defendant contends that the contract was on a strictly daily basis; that each day was a separate measuring period during which the plaintiff might order as much oil as it could take and market but must take approximately 1,000 barrels at least. The court adopted defendant's view.

The contract provision particularly involved in this issue is that " * * * the North American Company hereby agrees to deliver into the pipe line of the Globe Company such amount of the oil from the tanks on its lease as the Globe Company is able to take and market: Provided, however, that the *Globe Company shall take an average of 1,000 barrels daily or more during the life of this contract.*" In respect to the point now discussed, this quoted provision is ambiguous. The circumstances surrounding the parties when the contract was made remove this uncertainty.

When the contract was made, the situation was as follows: Defendant was engaged in producing crude oil upon a 40-acre leasehold. Plaintiff was engaged in piping and marketing oil. Defendant had 400,000 barrels of oil stored on its leasehold, mostly in pits, and an oil well producing 20,000 barrels a day. Plaintiff had a 4-inch pipe line (daily capacity 5,000 barrels) running from this leasehold to the railway shipping point of Smackover where it connected with a loading rack of 28 car capacity. Defendant had this oil and desired to market it. Plaintiff desired to profit from handling this oil through its pipe line. In so far as these parties were concerned, marketing of this oil through the pipe line had to be done by tank cars which could be loaded at Smackover. The big problem of defendant was to dispose of this rapidly increasing accumulation of oil. Plaintiff desired to profit in each of two ways: First, by purchase and disposition of the oil; second, by pipe line service in carrying the oil to Smackover and there loading it into tank cars for defendant. Between the two characters of service, the sale of oil to plaintiff was given priority of right. It was only "after the oil it has purchased has been loaded" that plaintiff

agreed to load into defendant's tank cars" "whatever amount of oil can be loaded through its line." These were the main things wrought into the contract.

The contract shows that it was drafted to make these mutual interests effective. The great common purpose of both parties and the highest interest of each was to keep the pipe line busy with this oil. Considering the urgent need (when the contract was first made) of physically disposing of the oil, it is hard to believe that the parties intended a contract which would hamper the movement of this oil and require retention in storage of an indefinite accumulating quantity to await the wishes of the plaintiff. Every interest of both parties required the undelayed movement of the oil and the use of the pipe line facilities. The court was right in his conclusion that the plaintiff was required to take oil every day and to the daily amount of approximately 1,000 barrels so that its total minimum receipts during the contract period would average 1,000 barrels a day.

### Term of Contract.

[2] The plaintiff contends that the entire duration of 80 days is one period under one contract which had been three times extended and that the provision that the contract may be "renewed" should be read "extended." Defendant contends that there were four successive contracts, each for 20 days, and that "renewed" must be given its ordinary meaning. There seems to be no reason to give the word "renewed" any substituted and unusual meaning. It fits well into the plan of the contract. We think the court wrong as to this point.

### Fire Loss.

[3] The parties had barely begun performance when a fire, caused by lightning, destroyed the oil in storage on the lease at the time the contract was made, caused the producing well to be shut down and prevented delivery before December 21st or 22d, when deliveries were resumed and continued until January 27th. There is no question but that the sole cause of this loss and the resulting condition was lightning. Also, it is not open to question that the parties were contracting concerning the oil on and produced from this particular leasehold and concerning no other oil. When this particular subject of contract was destroyed by act of God and in the absence of any provision in the contract removing such excuse for performance, performance was ex-

cused during the period when such act of God effectively prevented such performance.

Both parties concede that there was a period of necessary preparation, ending December 3d, during which oil could not have been delivered nor received. On December 3d, the first delivery (1,267 barrels) was made. There is no dispute that defendant was ready to deliver from then until the fire (December 7th) but that plaintiff did not wish to receive. Also, there is no question by either party concerning the sufficiency of the deliveries from December 22d to January 27th, both inclusive. Therefore, the period of the fire being eliminated, the only questions remaining are those which refer to the period of January 28th to February 15th, both inclusive.

### Delivery During Final Period.

[4] The evidence shows that when the well was opened after the fire, it produced about 20,000 barrels per day. From then until January 10th, oil was run both to plaintiff and to the Standard Oil Company. Apparently, plaintiff received what it wished during that time. The Standard received, during that time, slightly over 80,000 barrels. About January 15th or 18th, the well quit flowing and at that time defendant undertook to revive the flow by "swabbing"— the unrealized expectation being that the well would continue to produce from 1,000 to 1,500 barrels a day. Deliveries continued to plaintiff until January 27th. After that date production ceased and no deliveries were made thereafter.

Defendant contends that it is absolved, during this period, from admitted nonperformance by the considerations that the contract was for oil from this particular leasehold and that when production failed the subject of the contract ceased to exist. Plaintiff challenges this and says that defendant voluntarily incapacitated itself by selling over 80,000 barrels to the Standard in the period from December 21st to January 10th.

We think defendant should prevail. The contract clearly stated the subject-matter to be the oil from this leasehold. Also, it shows that the parties contemplated that defendant would dispose of its oil to other purchasers if it were not taken by plaintiff. There was no obligation to retain an indefinite amount of storage to await the wants of plaintiff. When the production stopped the duty to perform ceased unless defendant could reasonably have foreseen such stoppage at the time it disposed of the oil to the

Standard. The evidence is to the contrary as deliveries continued to plaintiff for 17 days after the last sale to the Standard.

On the undisputed facts of this record, a verdict should have been instructed for defendant.

The judgment is reversed and the case remanded for new trial.