(638 P.2d 963)
No. 52,175

SUNFLOWER ELECTRIC COOPERATIVE, INC., *Appellant,* v. TOMLINSON
OIL COMPANY, INC., *Appellee.*

Petition for review denied March 3, 1982.

Opinion filed December 31, 1981.

*L. Earl Watkins, Jr.,* of Diets, Hardman, Watkins & Calcara, of Great Bend, for the appellant.

*Norbert R. Dreiling,* of Dreiling, Bieker & Kelley, of Hays, for the appellee.

Before JUSTICE HERD, presiding, SWINEHART, J., and LEWIS L. McLAUGHLIN, District Judge Retired, assigned.

HERD, J.: This is a breach of contract action in which the trial

court relieved appellee of liability for breach under the doctrine of impossibility of performance. Sunflower Electric appeals.

Appellant, Sunflower Electric Cooperative, Inc., a member of the R.E.A. family, is a public utility in the business of generating electricity for wholesale to eight member cooperatives. Its main generating facility is located in Finney County. Appellee, Tomlinson Oil Company, Inc., is a corporation involved in oil and gas production. It owned a number of oil and gas leases in an area known as the Stranger Creek gas field in Leavenworth County.

On November 29, 1973, the parties executed an agreement for the sale and purchase of natural gas which is the subject of this action. Under the agreement, Tomlinson promised to sell and Sunflower to buy 3 MMCF (million cubic feet) of gas per day from the reserves in the Stranger Creek field. Tomlinson also promised to develop its reserves so as to guarantee delivery of 7 MMCF per day. The price was fifty-five cents per MCF (thousand cubic feet) for the first year after initial delivery, increasing one cent per MCF each year for three years. After the fourth year the price would be renegotiated or submitted to arbitration. Under an exchange agreement with Kansas-Nebraska Natural Gas Co., Inc., the gas would be delivered to a Cities Service storage facility in Leavenworth County. Kansas-Nebraska would then deliver an equivalent amount of gas to a point four miles south of Sunflower's generating facility in Finney County. Tomlinson had to build a 13.2 mile pipeline to the Cities Service storage facility and Sunflower a 4.5 mile pipeline to the Kansas-Nebraska exchange delivery point. For purposes of appeal, the following provisions of the agreement are particularly relevant:

"Section I. *Gas to be purchased and Sold Hereunder.* The gas to be sold by Seller and purchased by Buyer under the terms of this agreement shall be produced from Seller's gas reserves now existing and that will exist during the term of this agreement under Seller's Leasehold Area  .  .  .  .

.  .  .  .

"Section III. *Dedication of Acreage.* Seller shall dedicate to Buyer a gas supply from the reserves under the Seller's Leasehold Area up to 7 MMCF per day for a period of fifteen (15) years  .  .  .  .

"Section IV. *Deliverability and Development.* Seller shall deliver not less than 3 MMCF of gas per day at the commencement of delivery of gas as herein provided for, and shall proceed to systematically and expeditiously develop its leases in Seller's Leasehold Area in such a manner as to guarantee the maximum deliverability herein contracted for at the earliest possible time and to continue the maximum deliverability for the full term of this agreement.

. . . .
"Section XII. *Specific Performance.* Buyer and Seller each expressly recognize that the purchase of gas and the availability of gas to Buyer is the essence of this Agreement, that gas is a valuable and depleting natural resource, and that the private interests of Buyer as well as the interests of the consuming public of electricity served by Buyer would be irreparably damaged in the event that Seller failed to make the deliveries of gas herein agreed upon . . . The Seller and Buyer stipulate that the payment of money damages would not be adequate to satisfy the claims of Buyer or Seller for the breach of this agreement, and that by reason thereof this agreement shall be enforceable by specific performance, and that either party may seek specific performance thereof against the other."

Both parties constructed their respective pipelines which were completed by November 1974. Tomlinson breached the contract the first day and was never able to deliver the minimum amount of gas called for by the contract thereafter. In 1975 Tomlinson delivered only 88,479 MCF compared with 985,500 MCF it would have had to deliver to meet the minimum. In July 1976, Tomlinson stopped all production in the Stranger Creek field and hence deliveries under the contract. Sunflower had to look elsewhere for its natural gas supply. Sunflower then filed this action.

The trial court's findings of fact may be summarized as follows. The Stranger Creek field is located five to six miles northeast of an older field known as the McLouth field, now used as a storage area. The McLouth field, developed in the 1930's, at one time had 90 producing gas wells. Its history was extensively analyzed in a 1941 publication of the Kansas Geological Survey known as Bulletin 53. One of the early developers of the Stranger Creek field was Bill Iverson. Iverson was the consulting geologist on approximately fifteen wells in this field. From 1968 to 1970 Iverson and his partners, encouraged by Bulletin 53 and similarities to the older McLouth field, bought leases of 1200 acres in the Stranger Creek field. They then sold this acreage to J. A. Allisen in mid-1970. Allisen acquired additional leases and bought leased wells upon which pipe was set. In the fall of 1971, Allisen sold a one-half interest to Tomlinson and later another one-fourth interest. Ultimately Allisen and Tomlinson acquired 80 leases covering 9874.62 acres in the Stranger Creek field.

Prior to entering into the contract with Sunflower in November of 1973, Tomlinson had purchased 6 wells and drilled 6 wells. Of these twelve wells, only five (Pauley #1, Collins #1, Feverly #2, Kellison and Jones #1) were potential producers, with the remainder being dry holes or abandoned as not commercial. Multipoint back pressure tests, most of which were performed in

October, 1972, by Cities Service revealed gas flows for these five wells as follows: Pauley # 1 (675 MCF), Collins # 1 (1200 MCF), Feverly # 2 (846 MCF), Kellison (3680 MCF), and Jones # 1 (589 MCF). A multipoint back pressure test measures the relationship of short-term gas flow to the back pressure of a pipeline but is not a measure of the well's long-term capacity or the gas reserves. The presence of heavy oil in all these wells was noted early.

In November, 1974, the five wells were connected to the pipeline Tomlinson had constructed to the Cities Service storage facility and gas was produced and sold under the contract starting December, 1974. Tomlinson experienced problems with heavy oil immediately but was unconcerned because three wells, Pauley, Feverly and Collins, had been shut in for some time. The Pauley well never produced as the weight of fluid was heavier than the gas. The other four wells went on the line at a good flow of gas but went into a rapid decline. On February 4, 1975, E. B. Kreiter, production manager for Tomlinson, prepared a progress report in which he noted that the wells were "declining at an abnormally high rate which would indicate a small reservoir or one of limited permeability." On April 29, Tomlinson checked fluid levels on these wells and calculated bottom hole pressure. All wells had a decline in pressure and were full of fluid. In May of 1975, Tomlinson drilled Jones # 2 and Edmonds # 1, neither of which were commercial wells. In June of 1975, Feverly # 2 was temporarily abandoned. The remaining wells produced some small amount of gas through July of 1976, when all production stopped.

As production declined, Tomlinson found heavy oil fouling up all of its separators, tubing and meters. Kerosene and steam would not clean this equipment. The oil changed to a solid-like asphalt. A sample of the heavy oil from the Pauley # 1 well was found to have a viscosity of 100,000 centipoise at 100° F with a pour point of 90° F. Normal crude oil has a viscosity of 10 to 100 centipoise. Because of the heavy oil problem, Tomlinson decided not to spend any additional time or money in developing or producing in the Stranger Creek field.

The trial court summarized the testimony of the geologists and petroleum engineers as to why Stranger Creek failed to produce:

"Bill Iverson is a consulting geologist with 30 years experience. He was the well site geologist on most of the Holden - Tomlinson wells in the Stranger Creek

field and was familiar with other wells in the area. When he sold his interests to Allisen in 1970, he was of the opinion that the Stranger Creek field had commercial possibilities. He had formed no opinion on potential reserves and expressed none to Tomlinson. The new field appeared similar to the successful McLouth field, but with thinner McLouth sands. All wells had thick oil and the porosity and permeability of the producing sands was erratic. His present opinion is that there is no possibility of commercial production now.

"Robert Gill has been a petroleum geologist since 1941. In 1970, he was Vice President in charge of exploration with Tomlinson Oil. He reviewed the Iverson material received from Mr. Allisen and helped to decide to acquire for Tomlinson a three-fourths interest. He established a development program for drilling four wells and then two more based on Iverson's recommendations as to location. He thought the similarities to the McLouth field were very favorable. In a letter dated October 20, 1972, he estimated reserves of over 4 billion cubic feet of gas based upon the existing well measurements and the McLouth field production. He admits he has no background for calculating gas reserves as this is an area of expertise of the petroleum engineer.

"Edgar B. Kreiter has been a petroleum engineer since 1950. From 1970 to 1977, he was production manager for Tomlinson Oil and kept abreast of the Stranger Creek gas field development. It was his decision to build the Tomlinson pipeline. He thought he had enough data to estimate reserves volumetrically. His estimate initially was 450,000 MCF per quarter section or 27 million MCF for 60 quarter sections (27 billion CF). This estimate was based primarily on the McLouth field and the tests on the Kellison # 1 well. In 1976 after the heavy oil became a problem, he concluded that the oil was changing to a solid when it experienced pressure and temperature changes as it left the formation and started up the well bore. He thought this problem existed everywhere in the field and would plug the formations. It was his decision not to drill further in July of 1976. He doesn't think bottom hole heaters or steam would solve the heavy oil problem. He admits that Cities Service tests were probably wrong and that an independent audit of Gruy and Associates, Inc., Petroleum consultants, prepared for Tomlinson in August of 1973, shows reserves of only 4.375 million MCF (4.3 billion CF). His present opinion is that it is a good possibility that the reservoir is exhausted and there remain no commercial gas reserves. He did not think either the contract or prudent development required more drilling before the pipeline was completed.

"George Lathum Yates has been a petroleum engineer since 1934. He was consulted in 1974 by two persons who had a working interest in Tomlinson wells in Stranger Creek who wanted an estimate of reserves before investing in the Tomlinson pipeline. He obtained all information which Tomlinson had on the field. His opinion was that the data available to Tomlinson was insufficient to calculate reserves and further investment was unwise. In particular he felt the radioactive logs were insufficient to indicate porosity or water saturation. He made a further investigation after the wells went on the pipeline and developed heavy oil problems. His opinion was that the pressure drop in the wells was from exhaustion of the gas, not heavy oil problems. He thought Mr. Kreiter's estimate of reserves overly optimistic.

"Tom H. Green is a geologist with over 20 years experience. He was hired by plaintiff, Sunflower Electric, to review the available material on the Stranger

Creek field. His opinion was that the Tomlinson wells were similar to wells at the edge of the McLouth field which had been dry holes or experienced heavy oil problems. He thought that the lower sands in the Kellison well were filled with heavy oil and the gas came up first exhausting the reservoir. His investigation indicated no proven anticlinal features in the field and no dual induction or porosity logs. His opinion was that the field had no commercial possibilities and this could have been determined from pre-1973 data.

"Eddie J. Hudson is a consulting petroleum engineer with 20 years experience. He was hired by plaintiff to review the data on the Stranger Creek field. He thought the data on Stranger Creek was poor and that electric log resistivity curves and porosity logs should have been obtained. His opinion was that the Kellison # 1 well had gas in only the upper 6 feet to 8 feet with heavy oil below. The heavy oil only became a problem after the gas was depleted. The data is insufficient to estimate reserves under any standard method and Kreiter's estimate is far too optimistic. He would estimate no more than 1 billion CF of gas in the field. If heavy oil were the only problem, steam, pumping or heat might solve but there is no gas left. However, the Tomlinson drilling program after the contract was signed was prudent development and exploration."

From this conflicting testimony the trial court found:

"[T]hat the gas in the Stranger Creek field is exhausted and that heavy oil is a problem only because of the depletion of gas. The Tomlinson estimates of reserves when the contract was signed were over optimistic. However, the Tomlinson development program and operation after the contract was signed was reasonable and prudent and further efforts by anyone at this time would not result in production of any significant amount of gas from the Stranger Creek gas field."

In its conclusions of law, the trial court first held that the agreement was subject to the Uniform Commercial Code and that Sunflower's measure of damages under K.S.A. 84-2-712(2), was the difference between the cost of "cover," *i.e.,* fuel purchased in substitution for that due from Tomlinson, and the contract price. The court found that Sunflower's calculation of $2,614,011.13 based on the cost of replacement fuel for the four years of the agreement for which the price of gas was set was proper as damages under this formula. This amount is not challenged on appeal. Based on its finding that the gas in Stranger Creek was exhausted, the court denied specific performance.

The court then considered Tomlinson's liability for damages. The agreement contained an "uncontrollable forces" clause which the court held inapplicable. Again, this ruling is not challenged on appeal. The court did hold, however, that Tomlinson should be relieved under the doctrine of impossibility of performance. In so finding the court stated in part:

"[T]his is a contract where a particular gas field was being developed and a supply

of gas from the leases and acrege dedicated in that field is a basic assumption of the contract and the only source contemplated. Failure of the Stranger Creek gas field to produce sufficient quantities of gas to fulfill the contract for any reason other than the fault of the defendant is an excuse for non-performance under Restatement of Contracts, supra, § 283 or § 286, unless the defendant assumed this risk.

". . . Nothing in the contract guarantees, warrants or promises that a sufficient reserve exists and will exist to fulfill the contract and the Court cannot conclude that one party rather than the other assumed the risk of a particular reserve.

"The defendant has contended throughout that this is a case of supervening impossibility due to the unexpected problem with heavy oil. There is little question but what oil with a viscosity 10,000 times that of normal crude oil would and did produce unique and probably unsolvable problems with production. However, the weight of the evidence seems to now suggest that the Stranger Creek gas field is not similar to the McLouth field and the gas reserves in this field were quite small when the contract was signed. If this is correct, then we are dealing with original impossibility. This still makes no difference from a legal standpoint, so long as defendant Tomlinson was not at fault in failing to foresee this contingency. When the contract was signed, Tomlinson had five apparently good gas wells with multipoint back pressure tests indicating tremendous quantities of gas. Most of the geologists found similarities to the highly successful McLouth field nearby. Gas reserves are difficult to estimate prior to actual production and the plaintiff's witnesses thought the data insufficient to even try. Whether better data prior to execution of the contract would have given a better picture of the reserves is speculative. In order to accurately project reserves, it is necessary to have production, which requires a pipeline and a market, hence the contract. The Court finds that defendant Tomlinson was not at fault in failing to foresee the rapid depletion of the Stranger Creek field. The parties contracted on the basic assumption that the Stranger Creek leases contained substantial gas reserves. The defendant Tomlinson proceeded as a prudent and diligent developer in building the pipeline and then expanding its exploration. They are to be excused by reason of objective impossibility of performance, whether original or supervening. Restatement of Contracts, supra, §§ 281, 283, 286(1)."

The court also denied charges to Sunflower for the $262,209.55 it had spent on the pipeline constructed under the agreement in Finney County. From these rulings, Sunflower appeals.

Where the trial court has made findings of fact and conclusions of law, the function of this court on appeal is to determine whether the findings are supported by substantial competent evidence and whether the findings are sufficient to support the trial court's conclusions of law. *City of Council Grove v. Ossmann,* 219 Kan. 120, Syl. ¶ 1, 546 P.2d 1399 (1976). In determining whether a trial court's findings of fact are supported by the evidence, it is not the function of an appellate court to weigh conflicting evidence, pass on the credibility of witnesses or rede-

termine questions of fact, and our only concern is with evidence which supports the trial court's findings, and not with evidence which might have supported contrary findings. *Addis v. Bernardin, Inc.,* 226 Kan. 241, Syl. ¶ 2, 597 P.2d 250 (1979).

Accordingly, this court must determine whether the trial court's findings of fact are supported by the evidence and whether those findings support the legal conclusion that Tomlinson should be excused from its obligation under the contract because of the doctrine of impossibility of performance. The latter determination is one of law. Restatement (Second) of Contracts, ch. 11, Introductory Note, pp. 309-10 (1981). Moreover, insofar as determination of this case requires interpretation of the agreement itself, the standard of review is that regardless of the construction of a written instrument made by the trial court, on appeal the instrument may be construed and its legal effect determined by the appellate court. *State Bank of Parsons v. First National Bank in Wichita,* 210 Kan. 647, Syl. ¶ 1, 504 P.2d 156 (1972).

The law has long since recognized that impossibility, or as stated by the more modern authorities, impracticability of performance *may* relieve a promisor of liability for breach of contract. Such impracticability may arise after the contract, in which case it is referred to as "supervening" or may exist at the time of the contract, in which case it is referred to as "original" or "existing." The trial court found this to be a case of existing impracticability in that the weight of the evidence suggested that Stranger Creek never contained sufficient reserves to meet the contract requirement. The general rule as to existing impracticability is stated in Restatement (Second) of Contracts § 266 (1981):

"Where, at the time a contract is made, a party's performance under it is impracticable without his fault because of a fact of which he has no reason to know and the non-existence of which is a basic assumption on which the contract is made, no duty to render that performance arises, unless the language or circumstances indicate the contrary."

This statement of the general rule encompasses the exceptions to relief: (1) the impracticability must not have been caused by the promisor (fault), (2) the promisor must have had no reason to know of the impracticability (foreseeability); and (3) the language or circumstances may indicate that the promisor not be relieved because of the impracticability (assumption of the risk).

The Restatement rule adopts in large part the rationale of

section 2-615 of the Uniform Commercial Code. The Code clearly applies here. The sale of gas contemplated by the agreement was the "sale" of "goods." K.S.A. 84-2-105 and -2-106. See *Amoco Pipeline Co. v. Admiral Crude Oil Corp.,* 490 F.2d 114 (10th Cir. 1974). K.S.A. 84-2-615 provides in pertinent part:

"Except so far as a seller may have assumed a greater obligation . . . .

"(a) Delay in delivery or nondelivery in whole or in part by a seller . . . is not a breach of his duty under a contract for sale if performance as agreed has been made impracticable by the occurrence of a contingency the nonoccurrence of which was a basic assumption on which the contract was made . . . ."

Official comments 5 and 8 indicate that fault and foreseeability, as well as assumption of the risk, are exceptions to relief under this provision.

A distinction is also drawn between impracticability which is "subjective" and "objective." This has been described as the difference, respectively, between "I cannot do it" and "the thing cannot be done." See *State Highway Construction Contract Cases,* 161 Kan. 7, 67, 166 P.2d 728 (1946). Only objective impracticability may serve to relieve a party of his or her contractual obligation.

There appears to be no real dispute that the existence of sufficient reserves in Stranger Creek to meet the contract requirements was a "basic assumption" of the agreement. Since under the trial court's findings sufficient reserves do not exist, the general rule provides that Tomlinson should be relieved from liability, unless one of the exceptions applies. Sunflower's six points on appeal are overlapping and repetitious but may be reduced to the following: (1) the impracticability of performance was subjective, (2) Tomlinson was at fault in developing Stranger Creek, (3) lack of sufficient reserves was foreseeable by Tomlinson, (4) Tomlinson assumed the risk of impracticability, and (5) it would be inequitable to grant relief under the circumstances of this case.

We first consider the argument that this is a case of subjective impossibility. As the trial court found, most of the Kansas cases which have considered the doctrine of impossibility of performance have been found to involve subjective impossibility and thus relief has been denied. The general rule is stated in *White Lakes Shopping Center, Inc. v. Jefferson Standard Life Ins. Co.,* 208 Kan. 121, Syl. ¶ 2, 490 P.2d 609 (1971):

"When one agrees to perform an act *possible in itself* he will be liable for a breach thereof although contingencies not foreseen by him arise which make it difficult, or even beyond his power, to perform and which might have been foreseen and provided against in the contract." (Emphasis added.)

In *White Lakes* the alleged impossibility was that more financing was needed for a construction project than had previously been agreed to in a loan commitment. Impossibility, if it was such, was held to be subjective. See also *e.g., Wichita Properties v. Lanterman,* 6 Kan. App. 2d 656, 633 P.2d 1154 (1981), (inability to obtain liquor license); *Meyer v. Diesel Equipment Co., Inc.,* 1 Kan. App. 2d 574, 570 P.2d 1374 (1977), (difficulty in securing parts); *Bailey v. Talbert,* 179 Kan. 169, 294 P.2d 220 (1956), (inability to transfer franchise); *State Highway Construction Contract Cases,* 161 Kan. 7, (inability to complete construction project due to war related labor and equipment shortages); *International T. & R. Corp. v. Benscheidt,* 141 Kan. 416, 41 P.2d 737 (1935), (unprofitability of purchasing sugar for alcohol manufacture after alcohol permit revoked); *City of Topeka v. Industrial Gas Co.,* 135 Kan. 646, 11 P.2d 1034 (1932), (inability to obtain certificate to do business); *Drug Supply Co. v. Board of Administration,* 106 Kan. 256, 187 Pac. 701 (1920), (inability to furnish supplies after judicial sale of plaintiff's assets).

Sunflower's argument that the agreement for the sale of gas is a thing possible "in itself" ignores the agreement which was expressly limited to sale of gas produced from Stranger Creek. The trial court's findings of fact that Stranger Creek is exhausted and further efforts by anyone would not result in production is supported by the evidence. The trial court's finding also disposes of Sunflower's argument that "the use of pumping units and bottom hole heaters could have been utilized to improve production . . . ." Thus, the sale of gas from Stranger Creek is impossible for anyone to perform, making this a case of objective impossibility.

Second, Sunflower argues that the fault exception applies to Tomlinson because it failed to expeditiously develop Stranger Creek. This argument appears to be based on the fact only five wells were connected to the pipeline constructed to deliver gas under the agreement, and after it became apparent these wells would not produce sufficient gas to meet the contract requirements, only two additional wells were drilled, neither of which

produced. This argument must fail for two reasons. First, the trial court found "defendant Tomlinson proceeded as a prudent and diligent developer in building the pipeline and then expanding its exploration." This finding is supported by the evidence. Secondly, failure to drill additional wells cannot be deemed "fault" in light of the trial court's finding that the reserves are exhausted. Failure to develop Stranger Creek, whether expeditiously or not, did not contribute to the impracticability involved in this case, *i.e.,* the lack of reserves.

Because of the manner in which we dispose of this case we will discuss Sunflower's third and fourth arguments together. Those arguments are: the lack of reserves was foreseeable by Tomlinson and Tomlinson assumed the risk that the reserves would be insufficient. As both the Restatement and the Code indicate, the language *or circumstances* of a contract may indicate that a party has assumed an obligation to perform despite impracticability. Such an assumption of the risk may be implied and foreseeability may be a factor in such a determination. See Restatement (Second) of Contracts § 261, Comment *c* (1981). Official comment 8 to K.S.A. 84-2-615 states:

"The provisions of this section are made subject to assumption of greater liability by agreement and such agreement is to be found not only in the expressed terms of the contract but in the circumstances surrounding the contracting, in trade usage and the like. Thus the exemptions of this section do not apply when the contingency in question is sufficiently foreshadowed at the time of contracting to be included among the business risks which are fairly to be regarded as part of the dickered terms, either consciously or as a matter of reasonable, commercial interpretation from the circumstances."

Was the lack of reserves in Stranger Creek "sufficiently foreshadowed" at the time of contracting to be considered a risk assumed by Tomlinson? The trial court found Tomlinson was not "at fault" in failing to foresee the lack of reserves in Stranger Creek. This was based on the fact that when the contract was signed, Tomlinson had five wells with multipoint back pressure tests indicating sufficient gas to meet the contract requirements and the fact that most of the geologists found similarities to the successful McLouth field. The court also found, however, that multipoint back pressure tests do not provide a measure of reserves. The court specifically found that "[g]as reserves are difficult to estimate prior to actual production and the plaintiff's witnesses thought the data insufficient to even try." We think the

court applied too strict a standard of foreseeability. It may well be true under prudent business standards, Tomlinson *assumed* it had reserves in Stranger Creek. However, the evidence is overwhelming and the trial court's own findings are to the effect that such reserves are inherently unknown. Tomlinson, in its brief, supports this conclusion when it states that "[a]ll the experts agreed one does not know what is below the ground and that the responsible estimates can be way off." Green and Yates gave Tomlinson a negative report on reserves. The favorable reserve reports were by Tomlinson's employees. They based their opinion on Bulletin 53 pertaining to the McLouth field and a pressure test which admittedly did not pertain to reserves. We conclude Tomlinson should have foreseen Stranger Creek might not contain sufficient reserves.

In *Berline v. Waldschmidt,* 159 Kan. 585, 156 P.2d 865 (1945), the court applied foreseeability to deny relief on a claim of commercial frustration. In that case plaintiff was the owner of an undivided one-half interest in the oil and gas on a five-acre tract, and, under the terms of the deed, had the right to drill on the land. The deed was for a term of five years. Prior to the expiration of the five-year term and before plaintiff had drilled any wells, a federal law (passed as a war measure) prohibited drilling on a tract of less than forty acres. Plaintiff sought to extend the term of his deed due to this occurrence. The court denied relief, stating:

> "For our purposes it can be stated the question of whether the doctrine of commercial frustration is applicable depends upon the particular circumstances and conditions of each case as it is presented for consideration. So, also, it can be said it is predicated upon the fundamental premise of giving relief in a situation where the parties could not reasonably protect themselves by the terms of their contract against contingencies which later arose, and that it never applies to give such relief where the risk of the event that has supervened to cause the alleged frustration was reasonably foreseeable, and could and should have been anticipated by the parties and provision made therefor within the four corners of the agreement which it is contended should be supplemented through operation and application of the doctrine. If the events relied upon as bringing the doctrine into force and effect appear to have been reasonably foreseeable and controllable by the parties, they may not invoke its principles as a defense to escape their obligations and the contract is enforceable in accordance with the provisions to be found therein." 159 Kan. at 588-89.

The court found that at the time of the contract (May 27, 1939), war was foreseeable and that in any event the regulation of well acreage was well established prior to that date so that the prohi-

bition was foreseeable on that ground as well. See also *State Highway Construction Contract Cases,* 161 Kan. 7 (war foreseeable).

Tomlinson would have us abandon the rule that if the event was foreseeable the parties must make provision for it in the contract or be bound. It points out that Williston finds this rule "descended in the law from a time when it was more nearly true than it now is, because impossibility was more rarely an excuse." 18 Williston on Contracts § 1953 (3rd ed. 1978), p. 118. That treatise proposes the following test which Tomlinson would have us apply here:

"If the event causing the impossibility in question could not only have been anticipated but its occurrence could have been guarded against by the promisor (not the effect of it by a provision in the contract but the occurrence itself by preventing its happening), it is reasonable to assume that the promisor took the risk of the continued possibility of performance." p. 119.

Even were we to adopt this test of foreseeability, however, the present case falls within the next sentence of § 1953, which provides:

"A similar argument is appropriate where the promisor, although having no power to prevent the contingency, had superior knowledge of the possibility of its happening."

Here, Tomlinson, as a company in the business of oil and gas production, and as the owner of the Stranger Creek leases, and as the party making the estimates as to reserves, must be held to have had superior knowledge as to the possibility that the reserves might prove insufficient.

Having concluded that the lack of reserves was foreseeable to Tomlinson, we also conclude that Tomlinson assumed the risk that such would prove to be the case. The trial court correctly found that the agreement contains no express assumption of such an obligation by Tomlinson, but as indicated above, this may be implied by the circumstances of a particular case. Besides the factor that the lack of reserves was foreseeable to Tomlinson, we note that the agreement provided that "the purchase of gas and the availability of gas to Buyer is the essence of this agreement" and that Tomlinson was to develop the field so as to "guarantee" the maximum deliverability under the agreement. We find these provisions, particularly the former, significant. Sunflower agreed to build a 4.5 mile pipeline and loan Tomlinson the cost of its

gathering system, a total outlay of in excess of a half million dollars, based on Tomlinson's assurances of adequate reserves.

Most cases with analogous facts are simply applications of the general rule that relief will be allowed absent one of the exceptions. The general rule is particularly applicable where the existence of a specific thing is necessary for the performance of the contract and that specific thing is destroyed or fails to come into existence. See Restatement (Second) of Contracts § 263 (1981). Thus, one who contracts to sell and deliver a crop of fruit, vegetables, grain, or hay then growing on a specific tract of land, or to be grown on such a tract within a specified growing season, is discharged from duty by the destruction of that crop without fault. *Mercantile Co. v. Canning Co.*, 111 Kan. 68, 206 Pac. 337 (1922). This rule has been applied to an oil sales contract when the well which was the subject of the contract ceased to produce. *North American Oil Co. v. Globe Pipe Line Co.*, 6 F.2d 564 (8th Cir. 1925). See also *Housing Auth. v. E. Tenn. Etc. Co.*, 183 Va. 64, 31 S.E.2d 273 (1944), where it was held that a contract to supply natural gas which the parties contemplated would come from a particular field was excused when the field ceased to produce. It is of note that this was a jury case and that the instructions provided that the supplier must not have assumed the risk of failure of the field. The jury verdict for the supplier was affirmed.

Even when a specific thing is necessary for performance, however, the circumstances may demonstrate that a party has assumed the risk. 6 Corbin on Contracts § 1339 (1962), states:

"In any such case, however, the expressions of the parties, interpreted reasonably, may show that one party has assumed the whole risk, has warranted the possibility of performance or made himself an insurer. One who contracts to supply pasturage on specific land for a number of cattle may be found to have warranted that grass will grow and water run. [citing *Berg v. Erickson,* 234 F. 817 (8th Cir. 1916)]. One who promises to supply water for irrigation must look out for droughts and find the water at the favorable time and place; [citing *Northern Irr. Co. v. Watkins,* 183 S.W. 431 (Tex. Civ. App. 1916)]; it is the risk of drought, usual and unusual, that the promisee expects to eliminate. The water company may, of course, protect itself by a clause respecting drought and other causes beyond its control." p. 398.

A reasonable interpretation of the contract in this case shows that it was the risk of obtaining a supply of natural gas, which the contract recognized as a "depleting natural resource" which

Sunflower sought to eliminate. The fact that the agreement was specifically tied to the Stranger Creek field is significant in determining whether Tomlinson should be relieved. We gave effect to this limitation regarding Sunflower's argument of subjective impossibility. In light of the other circumstances, however, we conclude that the fact the agreement was so limited does not in itself compel relief for Tomlinson.

This is not a case where a crop failed through some natural disaster or even where an oil or gas field which had been producing so as to meet contract requirements failed. In this case a contract was entered into to supply a specified quantity of gas before it was determined that that quantity existed and without any provision being made in the contract for such a contingency. See *Gulf Oil Corp. v. F.P.C.*, 563 F.2d 588 (3rd Cir. 1977), *cert. denied* 434 U.S. 1062 (1978), where Gulf had contracted to sell gas to Texas Eastern. Upon discovering that it had vastly overestimated the reserves of the field from which it expected to draw most of the gas, it sought permission from the Federal Power Commission to increase the price it would charge under the contract, since to fulfill the contract, greater expense would be necessary. The FPC denied this request and the Third Circuit affirmed. The court relied mainly on its construction of the contract as expressly warranting delivery of the contract quantity of gas regardless of source. However, in response to an argument based on impossibility due to non-existence of the particular thing assumed necessary for the contract, the court stated that in cases where relief had been granted, the extreme economic hardship to the sellers resulted from forces of nature clearly beyond the sellers' control, not an error on the part of the sellers in estimating their supplies. See also *Moxham v. Sherwood Co. of West Virginia*, 267 F. 781 (4th Cir. 1920), where it was held that a lease for a royalty on ores produced from the land, with a fixed minimum, cannot be set aside for mutual mistake as to the existence of ore, where the evidence showed that the lessee had caused his engineer to examine the property and signed the lease on the engineer's report showing the existence of oil.

That Tomlinson assumed the risk reserves might be insufficient is, we think, demonstrated by (1) the language of the contract making purchase and availability of gas to Sunflower the essence of the agreement, (2) Tomlinson's foreseeability that the

reserves might not be sufficient, and (3) Tomlinson's expertise and superior knowledge as to the possibility of inadequate reserves. This compels a finding that Tomlinson not be relieved of liability for its breach. To hold otherwise would mean an oil or gas producer could enter into a long term supply contract, borrow money on it, gamble on the extent of its supply, know the purchaser is relying and expending sums thereon, then escape with impunity when the supply proves inadequate. If the producer wishes to be relieved of liability where its reserves are unknown, appropriate language can be inserted in the contract. In this case, it was not.

Having determined that Tomlinson is not entitled to be relieved of its obligations under the contract under the points already discussed, we need not consider Sunflower's fifth point as to equity.

The trial court found Sunflower damaged by Tomlinson in the amount of $2,614,011.13 from increased cost of natural gas for the first four years of the contract. It held damages for the balance of the contract to be speculative since the contract provided for renegotiation of price thereafter. The court's finding is supported by the evidence and was not appealed from. It will not be disturbed.

The trial court also found Sunflower could not recover for its cost of the pipeline since it was figured into the damages for cost of gas. With this finding we do not agree. Only a four year period was utilized in the gas cost damages. However, the pipeline was built to serve a fifteen-year contract. We therefore hold Sunflower shall recover 11/15ths of the costs of the pipeline, amounting to $192,287.00.

The judgment is reversed and remanded with directions to enter judgment for plaintiff in the amount of $2,806,298.13 and costs.

McLAUGHLIN, J., dissenting. With all due deference to my esteemed colleagues, I feel compelled to respectfully dissent from the majority opinion.

I conclude that the findings of fact and conclusions of law of the trial court adequately explain its decision and are supported by substantial competent evidence.

I would affirm the decision of the trial court.