NOT DESIGNATED FOR PUBLICATION

Nos. 118,591
118,603

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

CITY OF WELLINGTON, KANSAS,
*Appellee*,

v.

KANSAS DEPARTMENT OF HEALTH AND ENVIRONMENT, et al.,
*Defendants*,

and

STUART SHINLIVER, ANN SHINLIVER,
NANCY KOLLMORGEN, and
FRANCIS H. ROTH and LETA L. ROTH as Trustees,
*Appellants*.

MEMORANDUM OPINION

Appeal from Sumner District Court; R. SCOTT MCQUIN, judge. Opinion filed December 14, 2018. Affirmed.

*Amy Fellows Cline* and *Timothy E. McKee*, of Triplett Woolf Garretson, LLC, of Wichita, for appellants Stuart and Ann Shinliver and Nancy Kollmorgen.

*Joseph A. Schremmer*, of Depew Gillen Rathbun & McInteer, LC, of Wichita, for appellants Francis and Leta Roth.

*Patrick B. Hughes*, of Adams Jones Law Firm, P.A., of Wichita, for appellee.

Before BRUNS, P.J., MCANANY, J., and BURGESS, S.J.

1

PER CURIAM: The appellants are all owners of real property located in the vicinity, but outside the city limits, of the City of Wellington (City). They were supplied untreated water by the City by means of connections to the piping between the City's "A" water well field and its water treatment plant. Under this setup, untreated water from the City's wells was diverted to the appellants before it reached the City's water treatment plant. The City had no water lines for treated water extending to these properties. The practice of supplying rural water users with untreated water began around 1954.

*Events leading to the lawsuit*

The Kansas Department of Health and Environment (KDHE) has adopted administrative regulations governing public water supply systems. The regulation at issue here, K.A.R. 28-15-19, was adopted in 1982 and amended effective September 26, 1994. It requires all drinking water supplied to the public from a public water supply to be disinfected.

In 2006, the KDHE discovered the City's practice of supplying untreated water to 13 rural users, including the landowners involved in this appeal. When the KDHE notified the City of the regulatory violation, the City requested an extension of time to develop a procedure for addressing the affected customers. The City sent the affected customers a letter notifying them of the regulatory violation and informing them that the City would try to resolve the problem by April 1, 2007.

On January 17, 2008, the KDHE sent the City a letter regarding the City's ongoing violation and requested more information. City Attorney Mike Brown responded that the violation had not been resolved and set July 1, 2008, as the date for correcting the violation.

2

On August 4, 2008, the City received from the KDHE a directive that required the City to develop a final action plan that would result in compliance no later than March 1, 2009. Later that month, Brown sent the affected customers a letter asking to discuss the options that would resolve the violation. In October 2008, Brown sent a letter to the KDHE summarizing the City's options and requesting an extension of the compliance deadline to June 1, 2009.

It is unclear what transpired between June 1, 2009, and July 2015.

In July 2015, the City obtained an estimate of the cost to extend its treated water line to the affected customers. The estimated cost was $387,720, though the landowners dispute this amount. For 2016, the City budgeted $150,000 to deal with the untreated water issue, which was spent on bottled drinking water for the affected landowners and for the City's attorney fees.

A sanitary survey inspection conducted in September 2015 confirmed that the City was still in violation of K.A.R. 28-15-19. The survey also identified a direct cross-connection to a finished water distribution line within the treatment plant. The City contacted the affected customers in October 2015 in an effort to resolve the problem.

In January 2016, the KDHE demanded that the City stop delivering untreated water and remove the direct cross-connection to the finished water distribution line no later than May 1, 2016.

On May 3, 2016, the KDHE issued a directive that required the City to do three things: (1) provide quarterly notification to the 13 affected water customers along with certificates of delivery to the KDHE beginning May 1, 2016; (2) supply bottled water to the 13 affected water customers until the customers were disconnected from the untreated

water line beginning no later than May 1, 2016; and (3) remove the untreated well water line direct cross-connection or install an approved backflow prevention device and provide proof no later than June 1, 2016.

The City began providing bottled water to all customers being supplied untreated water on May 1, 2016. The City also provided proof that it installed the backflow prevention device on June 13, 2016.

On November 30, 2016, the KDHE and the City resolved the City's regulatory violation by entering into a consent order. Consent Order 16-E-11 required the City to cease providing untreated water to any users, including Francis and Leta Roth, Stuart and Ann Shinliver, and Nancy Kollmorgen. As amended, the consent order required that the customers be disconnected by November 1, 2017. The consent order also provided that in the event the City wanted to rectify the City's regulatory violation through the installation of a new transmission line to provide disinfected water to the customers at issue, standard KDHE review and approval would be required.

*The lawsuit*

The City filed this action on January 27, 2017, seeking a declaratory judgment that the City may disconnect the defendants from water altogether; that the City is legally prohibited from providing untreated water to the defendants; and that to the extent the City has an obligation to provide to the defendants water for domestic use, it can do so by providing bottled water at the City's expense.

The Roths answered and counterclaimed. They alleged that after a 1987 agreement terminated, the City agreed to furnish water service to the Roths in exchange for the Roths' payment of the ordinary rural residential water rate. The Roths later amended their

4

answer, asserting counterclaims for a declaratory judgment that they have a contractual right to continued water service. They also sought to enjoin the City from terminating water service. In the alternative, the Roths sought damages for breach of contract. The Roths also claimed the City is barred under the doctrine of promissory estoppel from discontinuing their water service.

The Shinlivers and Kollmorgen also filed an answer and counterclaim. They alleged the City owed them an obligation to provide water service under the terms of a 1954 Easement Agreement.

Each of the parties moved for summary judgment.

The district court denied all of the defendants' motions for summary judgment and granted the City's motion in full. The district court found:

- The right to free water created by the easement agreements was personal to the landowners who executed those agreements and did not run with the land and extend to successors-in-interest, including these landowners.
- The only obligation the City undertook was to supply untreated water to the defendants' properties.
- The City was now legally prohibited from providing untreated water to the defendants.
- The City's obligation to supply water to the defendants was discharged by the doctrine of impracticability, citing the Restatement (Second) of Contracts §§ 261, 264 (1981).

5

The district court concluded that the City may disconnect the City's lines supplying untreated water to the affected landowners and the City had no further obligation or liability with respect to providing water to any of these defendants.

The Roths, the Shinlivers, and Kollmorgen separately filed notices of appeal, which we have now consolidated for purposes of this review.

In this appeal we consider the summary judgment motions de novo and apply the same standards which the district court applied. See *Osterhaus v. Toth*, 291 Kan. 759, 768, 249 P.3d 888 (2011). Because the parties' competing summary judgment motions are mutually exclusive, we will focus on the City's motion which, if properly granted, excludes the possibility of relief on the defendants' motions.

Summary judgment is appropriate only when the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. K.S.A. 2017 Supp. 60-256(c)(2).

In oral argument before us the parties agreed that the facts set forth in the numbered paragraphs at the beginning of the district court's memorandum opinion on these summary judgment motions are uncontroverted. Under Supreme Court Rule 141 (2018 Kan. S. Ct. R. 205), the stated uncontroverted facts are those upon which the moving parties rely in seeking summary judgment. Accordingly, we will confine our analysis to those facts. We will review those facts and any inferences which may reasonably be drawn from them in the light favoring the appellants, the parties against whom the City sought summary judgment. See *Armstrong v. Bromley Quarry & Asphalt, Inc.*, 305 Kan. 16, 24, 378 P.3d 1090 (2016). The nub of the present controversy is the legal conclusions which should be drawn from the uncontested facts.

Some of the uncontroverted facts considered by the district court relate to landowners who have since settled and are not parties to this appeal. Here are the uncontroverted facts taken from the district court's memorandum opinion, somewhat reorganized and renumbered and without the facts relating to the parties who have now settled with the City.

1. The City operates a public water supply system. The City serves 3,723 customers with water utility service.

2. The City currently provides untreated water to the Shinlivers, Kollmorgen, and the Roths at their properties outside the city limits of Wellington by connections to the piping between the City's "A" well field and its water-treatment plant.

*The Hilton Agreement*

3. "On August 6, 1954 the City . . . entered into a Water Exploration and Easement Agreement with landowners Ella Leota Hilton and Ada Jane Hilton (the Hilton Agreement) with respect to the Northeast Quarter of Section 6, Township 33 South, Range 2 West of the 6th P.M. in Sumner County, Kansas. The Hilton Agreement permitted the City to drill for water on the property and granted a right-of-way easement for a water line and powerline. In relevant part the Hilton Agreement provided: 'It is further understood and agreed that the City will furnish water for stock and domestic use to the landowner without cost.'"

4. The Easement Agreement provided as follows:

"The City was provided the right to explore by drilling, together with the right of ingress and egress, for the purpose of providing water for the use of the City.

7

"The contract for exploration was to terminate in one year, unless water was produced from the premises. That is, if no water was discovered, the 'contract and easement shall be null and void' one year after execution. If water was produced from the premises, '[then] this easement for the production of water shall continue so long as water is produced.' Further, 'whenever the production of water is abandoned, then all of the City's rights and liabilities herein shall terminate.'

"The City was also provided authority to lay pipe and a power line to connect any well that produces water in sufficient quantities to the City's water system.

"The City agreed 'to pay any and all damages to the premises incurred in connection with' its exploration for water, 'all damages which may be incurred in connection with production' of water, and 'any damages in connection with' a 'pipe line, power line, or well maintenance.'"

5. The City recorded this Easement Agreement.

6. "On August 5, 1980, the City . . . entered into an Agreement with Prairie Creek Farms, Inc. (the Prairie Agreement I) which was then the owner of the land subject to the Hilton Agreement. Notwithstanding that the Hilton Agreement had no restriction on the number of wells that could be drilled, the Prairie Agreement I granted the City the right and privilege of drilling a proposed water well on the property covered by the Hilton Agreement. The Prairie Agreement I noted that the City and the landowner 'desire to make different provision, other than the one set forth in [the Hilton Agreement] as to the compensation to be paid or furnished the Landowner by the City for the rights and privileges hereinafter set forth.' It further provided that for the right and privilege of drilling one well 'the City shall furnish water, free of charge, to the present dwelling

8

house of Dean A. Miller, president of the Landowner, located in the Southwest Quarter of Section 29, Township 32 South, Range 2 West of the 6th Principal Meridian in Sumner County, Kansas, for domestic purposes only, for a period of twelve (12) months, commencing on September 1, 1980, and ending on August 31st, 1981.'"

7. "On March 5, 1986 Prairie Creek Farm, Inc., granted the City . . . an Easement for Water Well and for Pollution Control (Prairie Agreement II) to permit the City to drill, redrill, rework and place a water well in Section 6, Township 33 South, Range 2 West of the 6th P.M., and in Section 31, Township 32 South, Range 2 West of the 6th P.M. In exchange for these rights the City promised to furnish Dean and Norma Miller with 6,000 gallons of free water per month at their home for a period of ten years. Their home was located at 570 West 401th Street South."

8. "The City's current A-11 well was installed pursuant to the Prairie II Agreement."

9. "Stuart and Ann Shinliver are the current owners of a 77-acre portion of the land covered by the Hilton Agreement on which the A-11 well was installed and operates."

10. "The Shinlivers' residence was built in approximately 1994."

11. "Nancy Kollmorgen is the current owner of an approximately 3.7-acre portion of the land covered by the Hilton Agreement."

12. "Kollmorgen's residence was built in approximately 1914."

9

13. "The Shinliver Property and the Kollmorgen Property were a single parcel at the time of the Hilton Agreement with the residence on the Kollmorgen Property being the only residence on the tract at the time."

14. "Both prior to and after the division of the Shinliver Property from the Kollmorgen Property, the residence on the Kollmorgen Property received free water from the City."

15. "The deed by which the Shinlivers were conveyed the Shinliver property does not refer to the right to receive water from the City . . . as among those rights conveyed to the Shinlivers."

16. "The City's A-11 well is the only well the City operates on the land covered by the Hilton Agreement."

17. "Since . . . Stuart and Ann Shinliver took ownership of their residence in 2005, the City has furnished water for stock and domestic use to them without cost."

18. "Since . . . Nancy Kollmorgen . . . took ownership of her residence in 1976, the City has furnished water for stock and domestic use to her without cost. In fact, prior to that date, . . . Kollmorgen . . . rented this residence and also received water for stock and domestic use from the City without cost."

10

19. "Francis H. Roth and Leta L. Roth, as Trustees of the Leta L. Roth Revocable Trust dated August 13, 2003, own the Roth Property. Leta L. Roth is married to Joseph C. Roth. Brothers Joseph and Francis inherited the Roth Property from their mother, Rose B. Roth. Joseph has since transferred his interest to Leta's trust. The Roth Property is described as the Northwest Quarter (NW/4) of Section 8 and the Northeast Quarter (NE/4) of Section 7, all in Township 33 South, Range 2 West of the 6th P.M., in Sumner County, Kansas."

20. "Brothers Joseph Roth and Francis Roth grew up on the Roth Property in the house in the Northeast Quarter (NE/4) of Section 7. While they lived there, the family never had a water well capable of producing water for domestic use. Nor did they have city water or rural water service. Instead the family hauled water and stored it in a cistern."

21. "This was the situation until 1985, when the City became interested in the Roth Property as a possible source for [untreated] water to feed the City's public water supply system. The City already operated [untreated] water wells on land north of the Roth Property and wanted the option of expanding south along where it believed the same aquifer might extend."

22. "That same year the City drilled ten bore holes and three test wells on the Roth Property. These borings showed that the aquifer ceased or dried up at least one-half mile east of the Roths' house. The City never plugged any of these wells and they remain open and unplugged to this day."

23. "On June 19, 1987 the City . . . entered into an Agreement for drilling water wells and for a permanent easement (the Roth Agreement) with respect to the Northwest Quarter of Section 8, Township 33 South, Range 2 West of the 6th P.M. in Sumner County, Kansas. In relevant part the Roth Agreement provided:

> "'The City shall furnish the Owner, Rose B. Roth, without charge, three thousand (3,000) gallons of water per month at the dwelling house occupied by her in the Northeast Quarter of Section Seven (7), Township Thirty-three (33) South, Range Two (2) West of the 6th P.M. in Sumner County, Kansas, for a period of ten (10) years from the date of this Agreement, provided, however, if the said Rose B. Roth resides in said dwelling house beyond the aforesaid 10-year period, 3,000 gallons of water shall be furnished, free of charge, at said dwelling during each month that the said Rose B. Roth continues to reside in said dwelling house.'"

24. "Despite the results from its borings, on June 19, 1987, the City entered an Agreement (the '1987 Agreement') with the Roths for a permanent easement on the Northwest Quarter (NW/4) of Section 8 of the Roth Property for drilling water wells. In exchange for the right to take an easement on the Roth Property to drill three wells, the 1987 Agreement required the City to furnish Rose B. Roth 3,000 gallons of water per month at the Roths' house free of charge for ten years and so long thereafter as Rose lived in the house. By Resolution No. 2861, the City's governing body on June 2, 1987, authorized the mayor and the city clerk to execute the 1987 Agreement. Neither the 1987 Agreement nor Resolution No. 2861 states that the water to be supplied to the Roth house was to be [untreated]."

25. "Pursuant to the 1987 Agreement, the City built a water line to the Roth house to supply water. The City never exercised its right to take any easements under the 1987 Agreement."

26. "The 1987 Agreement does not address what was to happen after expiration of the free water service. In negotiating the 1987 Agreement, then-city engineer James D. Marsh told Joseph Roth, 'If and when [Rose B. Roth] ceased to reside there, the new occupant/owner would then be subject to normal rates and conditions.' Marsh's letter also does not state that the water to be supplied for free to the Roths' house would be [untreated]."

27. "Rose B. Roth no longer resides in the dwelling house in Northeast Quarter of Section Seven (7), Township Thirty-three (33) South, Range Two (2) West of the 6th P.M. in Sumner County, Kansas."

28. "On March 17, 1999, the Utility Office Supervisor for the City wrote Francis Roth regarding the 1987 Agreement on City Administration letterhead. The letter states that it had been brought to the City's attention that Rose B. Roth was no longer living at the Roth house which terminates the 1987 Agreement's provision for free water service. It then states, 'If I don't hear anything from you by April 12, 1999 concerning this matter, below is the rate at which you will be charged monthly [thereafter].' Then it sets forth the then-current City water rates. No mention is made that the water to be delivered would be [untreated] water."

29. "On April 2, 1999, Francis Roth replied to the City and confirmed that his mother had moved to a rest home. His letter states, 'However, my brother [Joseph] and I do stay in our home about one weekend a month and also for two or three weeks each summer. As you are probably aware from the meter readings, we [do] not use a lot of water. I would estimate that we use less than 500 gallons a month on average.' He then states, 'We also have no objection to your suggested monthly charge for the service.' He enclosed advance payment for the year 1999."

13

30. "Since April 1999, the City has continually furnished water to the Roth Property. The City has metered the Roths' water usage and charged the Roths its standard water rate for rural residential customers. The City has billed and accepted payment from the Roths for the water service. The Roths have paid all charges for water service in full."

31. "The City has delivered water to the Roths pursuant to its March 17, 1999, letter. The water it has furnished has been [untreated] water delivered directly from the City's wells on codefendants' land. The City alone chose what water to deliver. The Roths have never used this water for drinking. They use it for, among other things, cooking, bathing, washing, the indoor toilet, and watering their lawn. They drink bottled water."

32. "The City's officials were well aware of the 1999 agreement to sell water to the Roths. The City's internal documents indicate the Roths are 'in billing' and that '[t]hey do pay for the water.' Current utility director Jason Newberry admits, 'I have talked to the Roth family several times [in] reference [to] this issue.' Joseph and Francis Roth corresponded and personally met with then-city engineer Larry Mangan about the arrangement. Joseph Roth also discussed the issue with then-city manager Gus Collins and his successor, Shane Shields, both in person and over the phone. In August 2014, Joseph and Leta Roth met with Shane Shields about their water service."

33. "The City is the only source for water utility service for the Roth Property. The nearest rural water districts are Harper County Rural Water District 4, and Sumner County Rural Water Districts 3, 5, and 7. Harper County Rural Water District 4's nearest line is approximately 14 miles away from the Roths' house. Sumner County Rural Water Districts 3, 5, and 7 are not taking new customers in the Roths' area."

34. "Based on the City's borings, it's highly unlikely the Roths could drill a water well for domestic use at their house on the Roth Property. The City's borings indicate that

14

the aquifer that supplies water for the City's wells to the north runs out about one-half mile away from the Roths' house. It appears that if a domestic well is possible, it would need to be sunk a significant distance from the Roths' house, requiring construction of at least one-half mile of water line and either an electrical connection or a solar-powered pump. If the Roths were to drill a domestic well on their property, the water would be raw and undisinfected."

35. "Without water service from the City, the Roths' house would be untenable. There would be nothing to wash, bathe, or cook with. There would be no indoor toilet. As a consequence, the property value of the house and the Roth Property would diminish substantially or vanish completely. There is no substitute for having water service at the house."

*The Present Dispute*

36. "KDHE . . . adopted administrative regulations governing public water supply systems which require the disinfection of water supplied to the public from a public water supply."

37. "KDHE has demanded that the City cease providing [untreated] water to any users, including [the Shinlivers, Kollmorgen, and] the Roths, to comply with K.A.R. 28-15-19 which requires all drinking water supplied to the public from a public water supply to be disinfected. KDHE first discovered the City's practice of supplying [untreated] water to users in 2006, but the practice has nonetheless persisted to the present."

38. "The City has no water lines for treated water extending to the properties of the defendants. The City's engineers estimate the cost to install such lines in a manner

15

that does not create stagnation issues is $387,720.00, not including easement acquisitions or utility relocations."

39. "On November 30, 2016, the City and the KDHE entered into a consent order, Consent Order 16-E-11, requiring the discontinuation of serving customers with . . . untreated water. As amended, the order requires that the customers be disconnected by November 1, 2017."

40. "The City obtained an estimate to connect the Roths' house to a water line carrying treated water from the City's treatment plant. The estimate indicates a total cost of $159,480.00."

41. "The City filed this action on January 27, 2017, seeking a declaratory judgment that it may disconnect the Roths from 'free water' altogether, that the City is legally prohibited from supplying [untreated] water to the Roths, and that to the extent the City has an obligation to provide water it can satisfy that obligation by providing bottled water service at the City's expense."

42. "For 2016, the City budgeted $150,000 for the [untreated] water issue, which the City is spending on bottled drinking water for the defendants and the City's attorney's fees."

Turning to the parties to this appeal, the appellants consist of Francis H. and Leta L. Roth as trustees, Stuart and Ann Shinliver, and Nancy Kollmorgen. The Roths raise a number of issues not addressed by the Shinlivers and Kollmorgen, whose claims are founded on easement agreements which they contend are covenants that run with the land. We will consider the various issues separately, starting with the issues raised by the Roths.

16

*The Roths*

*Contract Formation and the Terms of Any Resulting Contract*

The Roths argue that Francis Roth entered into an agreement with the City through the exchange of letters between the City and Francis Roth in 1999. They contend that the contract evidenced by these letters required the City to provide the Roths with water service indefinitely.

Joseph and Francis Roth are the sons of Rose Roth, the owner of the Roth property in 1987. Joseph and Francis grew up on the Roth property. While they lived there the family did not have city or rural water service, nor did they have a well capable of producing water for domestic use. Instead, the family hauled water to the property and stored it in a cistern.

In 1985 the City drilled bore holes and test wells on the Roth property in hopes of finding water it could use for its public water system. Those borings failed to produce water.

On June 19, 1987, the City entered an agreement with Rose Roth that would enable the City to obtain a permanent easement on a portion of the Roth property in order to drill water wells. Consideration for the agreement was the following:

> "The City shall furnish the Owner, Rose B. Roth, without charge, three thousand (3,000) gallons of water per month at the dwelling house occupied by her [on the property] for a period of ten (10) years from the date of this Agreement, provided, however, if the said Rose B. Roth resides in said dwelling house beyond the aforesaid 10-year period, 3,000

17

gallons of water shall be furnished, free of charge, at said dwelling during each month that the said Rose B. Roth continues to reside in said dwelling house.'"

The City's governing body authorized the mayor and the City to execute this 1987 Agreement. Neither the 1987 agreement nor the City's resolution authorizing it states that the water to be supplied to the Roth house was to be untreated. Under the 1987 agreement, the City built a water line to the Roth house to supply water. The City never exercised its right to drill wells on the Roth property. The untreated water provided to the Roths came from the well on the property subject to the Hilton Agreement, which we will discuss shortly.

Rose Roth eventually moved out of the residence, and her right to free water ended. On March 17, 1999, the City informed Francis Roth, Rose's son, that Rose's leaving the Roth residence ended the 1987 agreement's provision for free water. The letter stated:

> "Enclosed you will find a copy of an Agreement made between the City of Wellington and Rose B. Roth, owner . . . .
> "The agreement was for free water service to be in effect for ten years for granting easement to construct wells on this property as long as she lived there.
> "It has been brought to the city's attention that she is [no] longer living there which terminates the agreement.
> "If I don't hear anything from you by April 12th, 1999 concerning this matter, below is the rate at which you will be charged monthly [thereafter]."

The letter sets forth the then-current City water rates. The letter does not state what type of water the City would provide.

18

On April 2, 1999, Francis Roth replied to the City and confirmed that Rose had moved to a retirement home and was no longer living in the residence. He stated:

> "However, my brother and I do stay in our home about one weekend a month and also for two or three weeks each summer. As you are probably aware from the meter readings, we [do] not use a lot of water. I would estimate that we use less than 500 gallons a month on average.
>
> "We appreciate having the water service and your past cooperation with us. We also have no objection to your suggested monthly charge for your service. . . .
>
> "I do not anticipate that we would use more than the minimum amount of water each month as we do not plan on the farm becoming a permanent residence. Should our plans change we will notify you."

Francis enclosed an advance payment for the year 1999.

Whether a contract exists depends on the intentions of the parties. When the legally relevant facts are undisputed, the existence and terms of a contract raise questions of law for the court to determine. *U.S.D. No. 446 v. Sandoval*, 295 Kan. 278, 282, 286 P.3d 542 (2012).

The Roths argue that the parties' 1999 correspondence and their subsequent performance is sufficient evidence of a contract. They claim the City undertook a contractual obligation to supply their house with water. But the central issue is whether, after Rose moved out, the City was obligated to continue to supply water ad infinitum so long as the Roths were willing to pay for it.

Under the 1987 agreement, the City was granted a permanent easement on the Roths' property in exchange for supplying Rose Roth with 3,000 gallons of free water per

19

month at her residence for 10 years and so long thereafter as Rose continued to live in the house.

The letters between the parties show that the City understood that its contractual obligation under the 1987 agreement to provide free water to the Roth household had ended. Neither party expressed an intention to enter into a formal contract or agreement to replace the 1987 agreement. Nothing in the letters speaks to the type of water the City would provide or the length of time the service would be provided. The City's letter merely communicated to Francis the amount the City would charge going forward for water used from the then-existing untreated water connection.

Francis agreed to pay the amount specified by the City when he stated, "We . . . have no objection to your suggested monthly charge for the service." Clearly, the parties agreed to the City providing untreated water. After all, the City continued to furnish untreated water to the Roths' property, metering the Roths' water usage, and charging the Roths its standard water rate for rural residential customers. The Roths paid in full all charges for untreated water at the property without objection. But the City made no promise with respect to how long it would continue to provide water service to the Roth household.

The Roths assert that the City promised to provide water service, and the promise has not been discharged or excused. They point to Article 2 of the Kansas Uniform Commercial Code, which applies to contracts for the sale of goods. K.S.A. 84-2-204(1) provides: "A contract for sale of goods may be made in any manner sufficient to show agreement, including conduct by both parties which recognizes the existence of such a contract." The Roths argue that the UCC applies to contracts for water service. See *Eureka Water Co. v. Nestle Waters North America*, 690 F.3d 1139, 1147 (10th Cir. 2012) (finding that purified bottled water qualified as goods); *In re Escalera Resources Co.*,

20

563 B.R. 336, 371 (D. Colo. Bankr. 2017) (finding that metered electrical energy qualified as goods for purposes of the bankruptcy statute); *Adel v. Greensprings of Vermont, Inc.*, 363 F. Supp. 2d 692, 696-97 (D. Vt. 2005) (water suppliers were sellers of goods under Article 2 of the UCC); *Zepp v. Mayor and Council of City of Athens*, 348 S.E.2d 673, 677, 180 Ga. App. 72 (1986) (sale of water was sale of goods within the purview of the UCC). In Kansas, the sale of natural gas has been recognized as the sale of goods subject to the UCC. See *Sunflower Electric Coop., Inc. v. Tomlinson Oil Co.*, 7 Kan. App. 2d 131, 139, 638 P.2d 963 (1981).

The Roths assert that under K.S.A. 84-2-204(1), a contract "may be made in any manner sufficient to show agreement" including by the parties' conduct. This includes contracts formed by the exchange of correspondence so long as the parties' actions indicate a binding obligation. K.S.A. 84-2-201 (see Official UCC Comment 1); *Smith & Loveless, Inc. v. Caicos Corp.*, 471 F. Supp. 2d 1140, 1151 (D. Kan. 2007) (finding a binding contract based on an exchange of correspondence and the parties' subsequent conduct).

But under either the UCC or general contract law, the Roths have to show that the City promised to supply the Roths with water for some set period of time. A specific time period was identified in the 1987 agreement. None was specified in the exchange of letters. The agreement to provide untreated water to the Roths in exchange for payment of the fee as set forth in the letter was terminable at the will of either party. The Roths fail to show that the City promised to provide water to their residence for any specific period of time.

Moreover, there is no indication that the parties had an understanding that any water supplied would be treated water. Untreated water was what was supplied to the property before Rose Roth moved away. In his letter of July 16, 2009, Joseph Roth

21

acknowledged that he understood that the water being supplied was untreated water and that the well water was not being used for potable purposes. He expressed gratitude for the City's continued cooperation and offered $5,000 to $10,000 to help defray the City's costs if they chose to install a treated water line or chlorination equipment. But there is no evidence that the City ever accepted this offer and agreed to provide the Roths with treated water.

The City argues further that even if Geri Neises, its Utility Office Supervisor, agreed on behalf of the City to provide water indefinitely to the Roths by extending a water line from the water treatment plant to the Roth residence, she had no authority to do so.

Cities that operate waterworks have the power to "sell and dispose of water" to "any person within or without said city." K.S.A. 12-808; see *Kansas Gas & Elec. Co. v. City of McPherson*, 146 Kan. 614, 622, 72 P.2d 985 (1937) (interpreting K.S.A. 12-808 to empower a city to extend electric lines to supply inhabitants of a neighboring town). Cities may delegate their contracting power to city officials and employees by ordinance. See *City of Wichita v. Basgall*, 257 Kan. 631, 633, 894 P.2d 876 (1995) (noting city ordinances are valid unless preempted by statute). Contracts made on behalf of a city by its authorized agent are generally binding on the city and are void only when they exceed the city's powers. *Resolution Oversight Corp. v. Kansas Health Care Stabilization Fund*, 38 Kan. App. 2d 899, 905, 175 P.3d 268 (2008); *Templeton v. Kansas Parole Board*, 27 Kan. App. 2d 471, 473-74, 6 P.3d 910 (2000).

Under K.S.A. 12-808, the City is empowered to sell water to persons outside the city limits. The City's ordinances empower the city manager and the manager's agents to make water connections with customers living outside of the city limits in areas where the City has already extended its water main. Wellington Municipal Code § 38-87. But

under Wellington City Codes § 38-86 and § 38-87, connections to a City water main outside the city limits must be approved by the governing body. Here, the governing body did not approve an extension to the Roth residence, and Neises did not have the authority to make any sort of promise to the Roths to do so.

Besides, under the ultra vires doctrine a city cannot enter into a contract beyond the scope of its powers. Any such contract is ultra vires, void, and unenforceable. "[A]ny reasonable doubt as to the existence of a particular power must be resolved against its existence." *Red Dog Saloon v. Board of Sedgwick County Comm'rs*, 29 Kan. App. 2d 928, 930, 33 P.3d 869 (2001). Here, the contract that the Roths advance contravenes the KDHE regulation against a city supplying untreated water. See K.A.R. 28-15-19.

Thus, even if the correspondence between the City and Francis Roth established a contract for water service, that contract was null and void under the ultra vires doctrine because the state regulation that prohibited the City from supplying untreated water came into effect well before the correspondence between Francis Roth and the City. "[C]ities are special entities that may not enter into contracts that contravene statutes or public policy. [Citation omitted.]" *Ramcharan-Maharajh v. Gilliland*, 48 Kan. App. 2d 137, 142, 286 P.3d 216 (2012); see *Peterson v. City of Parsons*, 139 Kan. 701, 708, 33 P.2d 715 (1934) (attempt to contract for lower salary than was provided for by city ordinance resulted in an illegal and void contract).

The Roths rely on *Goben v. Barry*, 234 Kan. 721, Syl. ¶ 2, 676 P.2d 90 (1984), for the distinction between (1) a contract that is void because its purpose obligates the parties to violate a statute, and (2) a contract that is not void because its purpose does not require the parties to violate the law but the parties violate the law in its performance. But here, it is not the manner in which the contract is performed that is the problem. Rather the

23

purpose of the contract is to provide untreated water, which can only be accomplished by the parties violating our public policy expressed in the KDHE regulation.

The Roths point out that Kansas courts have recognized that a plaintiff is not barred from enforcing a contract prohibited by a statute or regulation that is intended to protect the plaintiff. See *Young v. Barker*, 185 Kan. 246, Syl. ¶ 3, 342 P.2d 150 (1959); *Bank v. Hildebrand*, 103 Kan. 705, 708-09, 177 P. 6 (1918). The Roths also cite *Wycoff v. Quick Way Homes, Inc.*, 201 Kan. 442, 447, 441 P.2d 886 (1968), and *Stegman v. Offerle Coop. Grain and Supply Co.*, 151 Kan. 655, 657, 100 P.2d 635 (1940), in which a purchaser was permitted to enforce a contract notwithstanding the fact that aspects of the contract violated a statute or regulation. But for these cases to provide support for the Roths, there would have to be evidence that the contract they entered into with the City and which they now seek to enforce required the City to provide treated water in perpetuity. The only contract was the 1987 agreement to provide Rose with untreated water for so long as she lived on the property. That contract ended when Rose moved to a retirement home and was no longer living in the residence. The water that the City supplied thereafter was untreated water, and there was no obligation on the City to connect the Roth property to the City's treated water system.

Accordingly, the City was entitled to summary judgment on the basis that it had no contractual obligation to supply the Roths with treated water, and the district court did not err in so ordering.

*Promissory Estoppel*

Alternatively, the Roths argue they have a right to have the City supply them with water under the theory of promissory estoppel. In their counterclaims against the City, the Roths asked that the City be required to extend a water main for treated water from the

24

City's water treatment plant to their house. The Roths base their claims of promissory estoppel on their claim that the passage of time made their task of seeking an alternative water source more difficult.

Promissory estoppel is "an equitable doctrine designed to promote some measure of basic fairness when one party makes a representation or promise in a manner reasonably inducing another party to undertake some obligation or to incur some detriment as a result." *Bouton v. Byers*, 50 Kan. App. 2d 35, 41, 321 P.3d 780 (2014). "Promissory estoppel commonly applies when a promise reasonably induces a predictable sort of action but without the more formal mutual consideration found in contracts." 50 Kan. App. 2d at 42. This doctrine has been applied to cities. See *Ritchie Paving, Inc. v. City of Deerfield*, 275 Kan. 631, Syl. ¶ 4, 67 P.3d 843 (2003); *Blevins v. Board of Douglas County Comm'rs*, 251 Kan. 374, 383, 834 P.2d 1344 (1992).

To succeed on a claim of promissory estoppel, the Roths must show that the City's promise was clear and unambiguous in its terms and that the promise "define[d] with sufficient particularity what the promisor was to do. [Citation omitted.]" *Bouton*, 50 Kan. App. 2d at 42. The Roths want the City to be required to construct a water main for treated water from the City's water treatment plant to their house. The City never made a clear and unambiguous promise to provide treated water to the Roths, either before or after 1999. Further, we find no promise by the City—clear and unambiguous or otherwise—that it would provide the Roths with treated water by building a new treated water line to the Roths' home in the event that untreated water was no longer a valid option.

The Roths must also show that they acted in reasonable reliance and to their detriment on a clear and unambiguous promise by the City. See *Byers v. Snyder*, 44 Kan. App. 2d 380, 391, 237 P.3d 1258 (2010). Forbearance is a type of detrimental reliance

25

that supports a promissory estoppel claim. *Decatur Cooperative Association v. Urban*, 219 Kan. 171, 178, 547 P.2d 323 (1976). Here, the Roths rely on forbearance to establish detrimental reliance. They claim that they cannot seek an alternate source of water now as easily as they could have in 1999 when they began buying water from the City.

The uncontroverted facts establish that it would be difficult for them now to obtain an alternative source of water. But they do not establish that the difficulty they now face is greater than the difficulty they would have faced in 1999.

First, they assert that the nearest water line is approximately 14 miles away. They do not claim there was a closer water line they could have hooked up to in 1999.

Second, they claim that the Sumner County rural water districts are not taking new customers in the Roths' area. But they do not assert that these water districts would have accepted them as customers in 1999.

Third, they assert that drilling a well is not feasible. But they do not establish that drilling a well in 1999 would have been feasible. In fact, one of the Roths' uncontroverted facts is that in 1985 "the City drilled ten bore holes and three test wells on the Roth Property. These borings showed that the aquifer ceased or dried up at least one-half mile east of the Roths' house." It is further uncontroverted that in spite of the 1987 agreement for an easement for drilling water wells on a portion of the Roth property, "[t]he City never exercised its right to take any easements under the 1987 Agreement."

Finally, the Roths argue that whatever ground water was there in 1999 "has surely been diminished by the City's continuous pumping of the [aquifer]." This assumes there was a meaningful supply of accessible water in 1999 which is contradicted by the uncontroverted facts. But even if there had been a meaningful supply of accessible water

in 1999, had they chosen to drill their own water well in 1999 rather than rely on the City for untreated water, their well would have suffered the same diminution in supply that they say is the current situation.

Thus, their claim of forbearance does not satisfy an essential element of promissory estoppel. There is no showing that by not relying on the City to provide water in 1999 and by seeking alternative sources at that time, they would have been better off than the circumstances in which they now find themselves.

*Terminable at Will or Only for Cause?*

The Roths assert that the water connection through which they received untreated water was terminable only for cause and not at the will of the City. The Roths admit that the agreement reached through the exchange of correspondence in 1999 does not specify the time during which the City would continue to supply untreated water. But they assert that the City's continuing obligation is subject only to the limitations in the City's municipal code and their constitutional right to procedural due process. Under the City's municipal code, they claim their water service can only be discontinued for cause.

The Roths claim that the city ordinances limit the City's power to terminate water connection to specifically enumerated grounds. See Wellington Municipal Code § 38-118; Wellington Municipal Code § 38-445. Because none of the enumerated grounds exist here, they claim the City's termination of their water service is not permitted under its municipal code. This argument fails because the municipal code does not state that the reasons for termination set out in these provisions are the *only* permissible reasons for termination.

27

The Roths' water service was not arbitrarily or unreasonably terminated at the will of the City. Black's Law Dictionary defines "at will" as "[s]ubject to one's discretion" or "as one wishes or chooses." Black's Law Dictionary 155 (10th ed. 2014). The City did not choose to terminate the Roths' water service at its discretion. In its petition in this declaratory judgment action, the City first denied the Roths had any right to receive water from the City. But it also stated that the City was relieved of any contractual obligation it had to provide the Roths with water because the KDHE regulation made it illegal to continue to do so in the manner contemplated by the claimed contract. The KDHE ordered the City to discontinue water service to the Roths. By definition, the City did not terminate the contract "at will." Instead, the City filed the petition for declaratory judgment after entering into a consent order with the KDHE under which it was required to cease providing untreated water to any user—including the Roths—by November 1, 2017.

Under these circumstances, the Roths' water service was not arbitrarily or unreasonably terminated at the will of the City. Rather, the KDHE regulation prohibited the water service in its current form. Once the City entered into the consent order with the KDHE, the water service was being terminated for cause.

The Roths also assert they are entitled to constitutional due process protection before their water service can be discontinued. Relying on *Uhl v. Ness City, Kansas*, 406 F. Supp. 1012, 1018 (D. Kan. 1975), the Roths claim that a municipality may not arbitrarily and unreasonably terminate water utility service without due process.

The protection the Constitution provides is a right to notice and an opportunity to be heard with respect to the termination of their service. See *Dedeke v. Rural Water Dist. No. 5*, 229 Kan. 242, 249, 623 P.2d 1324 (1981). "A claim to continued utility service is held to constitute 'property' for due process purposes when underlying state law precludes

28

termination of service other than for good cause." 12 McQuillin Mun. Corp. § 35.48 (3d ed. 2017).

The Roths received notice of the potential for termination of the City's water service and an opportunity to be heard through the present action. The water service was not ordered terminated prior to the Roths receiving their constitutional right to procedural due process.

*Impracticability*

As a final argument, the Roths argue that the City's obligation to supply them with water service was not excused by impracticability. This argument is based on the Roths' allegation that the parties entered into a contract for water service in 1999.

The district court found that even if the City owed any of the defendants an obligation to provide water service, the obligation was excused by impracticability. See *Sunflower Electric Coop.*, 7 Kan. App. 2d at 138. Impracticability of performance may relieve a promisor of liability for breach of contract. Impracticability may arise after the contract, in which case it is referred to as "supervening," or it may exist at the time of the contract, in which case it is referred to as "original" or "existing." 7 Kan. App. 2d at 138.

Restatement (Second) of Contracts § 264 provides: "If the performance of a duty is made impracticable by having to comply with a domestic or foreign governmental regulation or order, that regulation or order is an event the non-occurrence of which was a basic assumption on which the contract was made." The Comment explains the rationale:

"This Section, like the two that precede it, states a specific instance for the application of the rule stated in § 261. It is 'a basic assumption on which the contract was made' that the

29

law will not directly intervene to make performance impracticable when it is due. Therefore, if supervening governmental action prohibits a performance or imposes requirements that make it impracticable, the duty to render that performance is discharged, subject to the qualifications stated in § 261. The fact that it is still possible for a party to perform if he is willing to break the law and risk the consequences does not bar him from claiming discharge."

Generally, a party to a contract will not be excused under the doctrine of impracticability if the seller had reason to know of the impracticability (i.e., the contingency was foreseeable). See K.S.A. 84-2-615, Comment 8. Here, K.A.R. 28-15-19 was adopted effective May 1, 1982, and amended effective September 26, 1994. So the City should have known that it would be unable to provide the Roths with untreated water before it allegedly contracted with the Roths in 1999. Under these circumstances, the doctrine of impracticability does not apply, as the contingency of the KDHE's Consent Order was foreseeable. The City cannot claim that any change in the law, or a failure of a presupposed condition, made its performance impracticable.

The Roths have failed to show the City had a contractual obligation to supply them with treated water for any specified period of time. In the absence of such a contract, the issue of impracticability was not relevant. The district court erroneously relied on the doctrine of impracticability, but it did not err in granting summary judgment to the City. See *Gannon v. State*, 302 Kan. 739, 744, 357 P.3d 873 (2015) (if district court reaches the correct result, its decision will be upheld even though it relied on the wrong ground or assigned erroneous reasons for its decision).

While the doctrine of impracticability does not apply here, the district court correctly granted summary judgment to the City.

30

*The Shinlivers and Kollmorgen*

*Rights Under the Easement Agreement*

The Shinlivers and Kollmorgen claim that the Easement Agreement was a covenant that runs with the land. They contend that the City cannot continue to use the wells the City drilled on the land without paying the agreed-upon consideration for the continued use of those wells.

Here, the issue is the legal conclusion to be drawn from the uncontroverted facts and whether under that legal conclusion the court can enter judgment as a matter of law. In any event, the interpretation and legal effect of written instruments are always matters of law over which our review is unlimited. *Thoroughbred Assocs. v. Kansas City Royalty Co.*, 297 Kan. 1193, 1207, 308 P.3d 1238 (2013).

> "'The primary rule for interpreting written contracts is to ascertain the parties' intent. If the terms of the contract are clear, the intent of the parties is to be determined from the language of the contract without applying rules of construction.' [Citations omitted.] If, on the other hand, the court determines that a written contract's language is ambiguous, extrinsic or parol evidence may be considered to construe it. [Citations omitted.] In addition,
> "'"[a]n interpretation of a contractual provision should not be reached merely by isolating one particular sentence or provision, but by construing and considering the entire instrument from its four corners. The law favors reasonable interpretations, and results which vitiate the purpose of the terms of the agreement to an absurdity should be avoided. . . . [Citations omitted.]"'
> " . . . But, if the language of a contract is ambiguous and the intent of the parties cannot be ascertained from undisputed extrinsic or parol evidence, summary declaratory judgment is inappropriate. [Citations omitted.]" *Waste Connections of Kansas, Inc. v Ritchie Corp.*, 296 Kan. 943, 963-64, 298 P.3d 250 (2013).

31

In 1954, the City entered into Water Exploration and Easement Agreements, which granted free water to the landowners who granted the easements. The Shinlivers and Kollmorgen were not parties to those 1954 Easement Agreements, but they claim the right to receive free water is a right that runs with the land. Hence, we must determine whether the parties intended for the promise of free water to run with the land and pass to the landowners' successors in title.

One of the elements that must be established for a covenant to run with the land is that the grantor and grantee must intend that the covenant run with the land. *Jeremiah 29:11, Inc. v. Seifert*, 284 Kan. 468, 472, 161 P.3d 750 (2007); *Schlup v. Bourdon*, 33 Kan. App. 2d 564, 569, 105 P.3d 720 (2005) (citing 21 C.J.S., Covenants § 25). Here, the parties agree that the only element at issue is intent.

Although the Easement Agreements differ somewhat, the uncontroverted facts show that each agreement included the following:

"The City was provided the right to explore by drilling, together with the right of ingress and egress, for the purpose of providing water for the use of the City.

"The contract for exploration was to terminate in one year, unless water was produced from the premises. That is, if no water was discovered, the 'contract and easement shall be null and void' one year after execution. If water was produced from the premises, '[then] this easement for the production of water shall continue so long as water is produced.' Further, 'whenever the production of water is abandoned, then all of the City's rights and liabilities herein shall terminate.

"The City was also provided authority to lay pipe and a power line to connect any well that produces water in sufficient quantities to the City's water system.

"The City agreed 'to pay any and all damages to the premises incurred in connection with' its exploration for water, 'all damages which may be incurred in

32

connection with production' of water, and 'any damages in connection with' a 'pipe line, power line, or well maintenance.'

"Each of the Easement Agreements provided, "It is further understood and agreed that the City will furnish water for stock and domestic use to the landowner without cost.'"

The Shinlivers and Kollmorgen provide numerous reasons to support their assertion that the successors in interest to the Hilton Agreement have a right to receive free water from the City. We address each of the defendants' arguments in turn.

The Shinlivers and Kollmorgen first claim that the language of the Hilton Agreement provides that the City's promise to supply free water to the landowners is a covenant that runs with the land. But we find no indication in the Hilton Agreement that the City's promise to supply water to the landowner was intended to run with the land. The agreements specified that the City will furnish water to "the landowner." In the Agreement, "Landowner" is defined as specifically named individuals. The Easement Agreements do not provide a clause expressing that they will inure to the benefit of the landowners' successors in interest, which the parties could have easily done if it was the parties' intent. The lack of such an expression suggests that the right to free water was specific to the named landowners and did not run with the land.

The Shinlivers and Kollmorgen point out that the term "Landowner" is capitalized at the beginning of the Easement Agreements, where it refers to specific landowners, but the term is not capitalized in the later sentence referring to the City providing the landowner with water at no cost. It is interesting to note that the City entered into several Easement Agreements in 1954 with nearly identical terms. Although "landowner" is capitalized in the definition section of the Hilton Agreement, it is not similarly capitalized in the definition section of the M.H. and Ethel Ross Agreement. It seems odd that the

33

City intended the City's liabilities under the Hilton Agreement to run with the land but not under the Ross Agreement.

The Shinlivers and Kollmorgen assert that the failure to capitalize the term "landowner" later in the agreement signaled that it did not refer to the specific landowners named in the agreement but instead encompassed successors in interest. See *Regency Square North Shopping Ctr. 14 LLC v. Kansas Kurry LLC*, No. 115,770, 2017 WL 2212088, at *3-4 (Kan. App. 2017) (unpublished opinion); *Environmental Products Corp. v. King Companies, Inc.*, 47 F.3d 1164, at *5 (4th Cir. 1995) (unpublished opinion) (the court found significance in the fact that the term "off lease" was capitalized in every section except for one). But in *Georgia v. Interlocal Risk v. Sandy Springs*, 788 S.E.2d 74, 77, 337 Ga. App. 340 (2016), the court recognized that "failure to capitalize a term does not always mean that the uncapitalized term lacks the capitalized term's specifically defined meaning."

Here, the word "landowner" is capitalized in the sentence in which it is defined, but it is not capitalized anywhere else in the body of the document even though it is repeatedly used. If the parties had intended the word "landowner" to be specific to the named landowners and not apply when the word was not capitalized, then there would have been no point in defining the term since it was only capitalized in the definition. We find no significance in the capitalization or lack of capitalization of the term "landowner" within the Hilton Agreement.

Next, the Shinlivers and Kollmorgen assert that the Hilton landowners intended that the original landowners' right to free water would follow the land because the land would be worthless without water. However, the Easement Agreement did not restrict the landowners from drilling their own well, so it does not necessarily follow that the Hilton landowners thought their successors in interest would be left without a source of water.

34

The Hiltons failed to include a clause indicating that the free water followed any successors in interest. Without such a clear indication, it appears that the parties intended for the water benefit to end with the stated landowners.

The Shinlivers and Kollmorgen also claim that the attendant circumstances indicate that the covenant should run with the land. See *Overland Park Savings & Loan Ass'n v. Miller*, 243 Kan. 730, 738, 763 P.2d 1092 (1988) (in determining the parties' intentions, the attendant circumstances must be considered). The defendants assert that the parties intended the Easement Agreements to run with the land because of the substantial cost of performance and substantial benefits of continued performance. In other words, the City intended to continue using the easements so long as the wells produced water. And the landowners expected the covenants to run with the land because if the City initiated commercial production of water on their land, they would no longer have access to water themselves. There are no facts included in the uncontroverted facts of the summary judgment motions that support this assertion, so it is not properly before us. There is no indication that the landowners intended to give up their access to water by granting the City the easement. In fact, the City's use of the water does not preclude the defendants from also extracting water for domestic use. See K.S.A. 2017 Supp. 82a-705.

The Shinlivers and Kollmorgen argue the district court erred in distinguishing the Easement Agreements from the free gas clauses in oil and gas leases. But as the district court accurately notes, free gas clauses in oil and gas leases are a form of rent. As such, the free gas is necessary for the entire term of the oil and gas lease, without respect to the transfer of ownership of the property. See *Jackson v. Farmer*, 225 Kan. 732, 737-38, 594 P.2d 177 (1979). Their analogy between easements for municipal water wells and oil and gas leases fails because a purchaser of an easement does not owe rent to the successors of a grantor of an easement. Rather, the City as an owner of an easement owns all of the

35

property rights associated with that easement. The City did not have a continuing obligation to provide free water as a form of rent.

Finally, the Shinlivers and Kollmorgen argue that the parties' course of dealing shows an intent for the free water provision to run with the land. As noted, even though the land had changed hands, the City continued to provide successors in interest with free water despite the fact that the Easement Agreement did not contain a provision requiring it to do so.

We find that the biggest obstacle to their assertion that the City's obligation to provide free water runs with the land is that the water that was being supplied to the parties from the land was untreated water. There was no provision in any agreement that the City was obligated to provide the parties with treated water in the event that the untreated water was no longer adequate or available. Here, the City's obligation to provide free water ended with the KDHE Consent Order requiring it to comply with K.A.R. 28-15-19 and cease providing the landowners with untreated water.

Moreover, the uncontroverted facts show that the City no longer took water from the wells established under the Hilton Agreement. In 1980, the then-owner of the property subject to the Hilton Agreement entered into the Prairie Agreement I and then the Prairie Agreement II in 1986. A key uncontroverted fact provided in the summary judgment motion is that the City's sole operating well on the property originally covered by the Hilton Agreement, A-11, was installed under the 1986 Prairie Agreement II. It does not date back to the Hilton Agreement.

Accordingly, any well that was installed under the terms of the Hilton Agreement has been abandoned. Because the Hilton Agreement provided that "all of the City's rights and liabilities" terminate when the production of water is abandoned, the City no longer

36

has any ongoing responsibilities under the Hilton Agreement. The sole operating well is subject to the terms of the 1986 Prairie Agreement II. Neither the Shinlivers nor Kollmorgen assert any rights under the 1986 Prairie Agreement II.

*Impracticability*

The circumstances of the Shinlivers and Kollmorgen differ from those of the Roths when it comes to considering the doctrine of impracticability. K.A.R. 28-15-19 was not adopted before the Easement Agreements. Here, the change in the law with the adoption of K.A.R. 28-15-19 made performance under the Easement Agreements impracticable only if the City was obliged to provide the Shinlivers and Kollmorgen with water no matter the circumstances. The facts show that any obligation to provide the parties with water was understood to be untreated water directly from the wells on the property or from lines leading from the wells to the City's water treatment plant. Because the City did not have an obligation to provide the Shinlivers or Kollmorgen with treated water, the district court did not err in granting summary judgment to the City.

We need not address the City's remaining arguments because we have already determined that the City is entitled to summary judgment. Thus, these remaining arguments are moot. The district court did not err in granting summary judgment to the City and in denying relief on the defendants' motions.

Affirmed.